**Affirmed and Opinion on Remand filed July 24, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-08-00846-CR
_____

**LARRY JOSEPH TILLMAN, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1059831**

---

## OPINION ON REMAND

This appeal arises from appellant Larry Joseph Tillman's conviction for capital murder and comes to us on remand from the Court of Criminal Appeals of Texas. *See Tillman v. State*, 354 S.W.3d 425 (Tex. Crim. App. 2011). We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The complainants, Amandre Wilson and her fiancé, Joseph Liebetreu, were returning to Wilson's residence late in the evening of December 21, 2005, following a

charity ball in the Galleria area of Houston. While driving home, one of the complainants turned on the dome light in their vehicle. This brief flash of light drew the attention of appellant, Malcolm Williams, and Cornelius Clark, who were driving around looking for a way of making money. The trio, having noticed the complainants' attire, decided the complainants "would be easy picking . . . to rob."

The trio followed the complainants to Wilson's residence, which was located on Floyd Street in a gated townhome complex. Immediately after the complainants drove through the security gate, appellant was dropped off by his companions and walked through the open gate into the complex. The initial plan was to rob the complainants in their garage, but appellant was momentarily delayed because he had to hide from two pedestrians walking down the driveway and was unable to reach the complainants before the garage door closed. Undeterred, appellant walked to the front door of Wilson's townhome and rang the doorbell. In response to the doorbell, Wilson partially opened the door but left the security chain in place. When Wilson realized the danger, she managed to close the door but appellant quickly kicked it in.

Witness Ricardo Avila lived across the street from Wilson's townhome. Witness Avila was still up shortly after midnight on December 22, 2005 when he heard two gunshots coming from the direction of Wilson's townhome. Witness Avila then heard Liebetreu scream: "Hey, you get out of here." Witness Avila then heard two more gunshots. Following the second set of gunshots, Witness Avila saw an extremely tall African-American male walking quickly from Wilson's front door.[1]

Witness Avila, a teacher and part-time hairdresser, was accustomed to observing facial details and he testified that he got a good view of the African-American male's face. Witness Avila ran to his neighbor Bruce Coy's house and knocked on his front door.

---

[1] Witness Avila testified that he noticed that the African-American male's shoulders were about four inches above the top part of the black gate in the fence surrounding the townhome complex. The fence is about six feet tall.

Witness Avila then called 9-1-1. After the police arrived, Witness Avila informed the police that the African-American male was wearing a black thigh-length coat and a knit cap and was carrying a full garbage bag over his shoulder.

Dan Christoffel lived in the same townhome complex as Wilson. While riding with his brother Coy Christoffel down Leverkuhn Street, which intersects Floyd Street, Christoffel saw a tall African-American male running toward their vehicle sometime shortly after midnight on December 22, 2005. Christoffel observed the African-American male suddenly stop running and begin walking when he saw the headlights from Coy Christoffel's vehicle. The African-American male continued walking toward Christoffel. Christoffel passed within four to six feet of the African-American male. Christoffel testified that the two looked at each other as Coy Christoffel's vehicle drove by. According to Christoffel, the African-American male had a baby face and he was wearing an oversized, dark, thigh-length coat, and a knit cap. Christoffel thought the man looked tall and muscular.

When paramedics and police arrived, they determined that both complainants were dead at the scene. They also discovered a number of bloody footprints inside and outside Wilson's townhome. Police officer Jeff Cruser worked in the crime scene unit of the Houston Police Department's homicide division and he was assigned to handle this crime scene. Cruser photographed and measured some of the bloody footprints. The photographs eventually were sent to the Federal Bureau of Investigation laboratory. During trial, Special Agent Eric Gilkerson testified he is a shoe print and tire tread examiner for the F.B.I. Gilkerson testified the shoe prints were made by a Reebok I3 pressure mid shoe manufactured between 2002 and 2004. Gilkerson testified that he believed a professional basketball player named Allen Iverson was associated with this particular shoe.

Other evidence came from the testimony of Bobby Williams (no relation to Malcolm Williams). Hoping to collect money owed to him by a young man he knew only

3

as Jabo, Bobby Williams went to the Flamingo Square Apartments in the early morning hours of December 22, 2005, because Jabo's parents lived there. Jabo was not there when Bobby Williams arrived, but he decided to wait and he passed the time talking to Jabo's parents in the apartment's kitchen. Twenty to thirty minutes later, Jabo and two other African-American males entered the apartment through the kitchen or back door. Jabo was the first to walk into the apartment. The second man who entered the apartment was a "tall, slender, light complected [sic] man." The third male to enter the apartment was "tall, six-one, six-two, six-three, big guy." According to Bobby Williams, the third man had a dark complexion and was bigger than the second man who entered. The third man was wearing a dark, mid-thigh length coat and a knit cap. He was also carrying a revolver and a large trash bag. At the time, Bobby Williams recognized the second and third males from the neighborhood, but he did not know their names.

The three men proceeded through the kitchen and into the living room where a fourth African-American male had been playing videogames.[2] The three newcomers gathered around the couch and began displaying items from the trash bag and talking to the videogame player. Bobby Williams then heard the third, bigger male describe the robbery. According to the third male, when Wilson refused to remove the security chain and closed the door, he forced his way in by kicking in the door. He then said he shot Wilson because she would not cooperate and he shot Liebetreu because he had seen his face.

Bobby Williams observed the men remove several items from the garbage bag. These included a small, expensive-looking purse. According to Bobby Williams, the purse looked like it had snake skin or snake scales engraved on one side of the purse while the other side appeared to be smooth. Bobby Williams also testified that the purse had gold links on the shoulder strap and the handle was gold in tone. Bobby Williams also

---

[2] Officer Xavier Avila (no relation to Witness Avila) testified that he entered the apartment when he questioned Jabo's parents as part of his investigation. Officer Avila testified that the apartment's layout matched Bobby Williams's description.

saw two wrapped Christmas presents dumped out of the bag. Bobby Williams saw a single diamond ring with a wide band and a gold bracelet and necklace. Bobby Williams also overheard the men talking about selling the items. Finally, Bobby Williams heard the third man, the "big guy," joking about Jabo making him run for the car after he left the townhouse. Bobby Williams then left the apartment; as he left, he wrote down the license plate number of the silver Crown Victoria the three men were driving.

Later that same morning, Bobby Williams attempted to contact Houston Police officer David Bonin, an officer he had worked with on other cases, but Bonin was on vacation. Bobby Williams then went to LBJ Hospital and spoke with a Harris County Sheriff's Office deputy who recommended that he contact Crime Stoppers. Bobby Williams called Crime Stoppers with the information he learned at the Flamingo Square Apartments.

Officer Xavier Avila was a homicide investigator with the Houston Police Department. Officer Avila and his partner were assigned to do follow-up investigation on the complainants' murders when the officers arrived to start their shifts about 8:00 a.m. on December 22, 2005. Once at the crime scene, Officer Avila talked to Witness Avila. Witness Avila told Officer Avila that the person he had seen leaving Wilson's townhome was about six feet in height. However, in a conversation on December 28, 2005, Witness Avila also indicated the suspect's height by referring to the six-foot tall iron fence surrounding the townhome complex. According to Witness Avila, the suspect's shoulders were above the top of that fence. Based on this information, Officer Avila believed Witness Avila's initial height estimate was incorrect and he should be looking for a person at least six feet, five inches tall.

About 11:00 a.m. on December 22, 2005, Officer Avila received a Crime Stoppers tip. The tip provided a vehicle description;[3] a license plate number; a partial name,

---

[3] The vehicle was described as a 1995 Silver Crown Victoria.

5

"Jabo;" and an apartment complex name, Flamingo Square Apartments. The police checked the apartment area for the vehicle but did not find it. The police also did a computer check on the license plate number and discovered the name of the registered owner. The police learned the vehicle had been sold by the registered owner to a car dealership in early December. The dealership sold the vehicle at an auction to a used car dealer. The police then learned that the used car dealer had sold the vehicle on December 7, 2005, to Malcolm Williams.

The investigators discovered there was a warrant for Malcolm Williams's arrest. Another officer involved in the investigation located an address for Malcolm Williams and he was arrested on December 28, 2005. Malcolm Williams led the police to the vehicle's location. The vehicle was impounded and two individuals in the vehicle, Damon McClain and Shawn Walker, were detained. Malcolm Williams also told the police that Jabo's full name was Cornelius Clark. Clark was in the Harris County Jail on a drug charge. Based on the four names the police now knew, Officer Chappell, who was also working in the investigation, prepared four photo spreads — one containing the photograph of each of the men the police thought may have been involved in the murders.[4] On December 28, 2005, the four photo spreads prepared by Officer Chappell were shown to Witness Avila and Christoffel. They did not identify anyone shown in the photo spreads as the person they had seen leaving the crime scene.

While these events were unfolding, Officer Avila had no information on the Crime Stoppers tipster. On January 3, 2006, Officer Bonin returned from vacation and discovered a voicemail message from Bobby Williams. Officer Bonin turned the information in that message over to the homicide department. Bobby Williams had not left his contact information in the message so Officer Bonin had no way to get back in touch with him. Bobby Williams called Officer Bonin again later in January. Officer

---

[4] As of this time, the police had not yet identified appellant as a suspect and his photo was not contained in any of the photo spreads.

Bonin got his contact information at that time and turned that over to the homicide investigators.

On January 17, 2006, Witness Avila met with a sketch artist who depicted the man Witness Avila had observed fleeing Wilson's townhome. Included on the sketch was the following written description: "dark[,] thin to average build[,] wide shoulders[,] late 20's early 30's[,] over 6'[,] probably 6'2" to 6'4"." At the time Witness Avila met with the sketch artist, appellant still was not a suspect in the case and no photo spreads had included his photograph.

On January 20, 2006, Officer Avila finally learned Bobby Williams's name from Officer Bonin. Officer Avila had difficulty locating Bobby Williams because he worked as a long haul trucker. Officer Avila contacted Bobby Williams in California on January 27, 2006. During the ensuing conversation, Bobby Williams told homicide investigators what he had heard in the Flamingo Square apartment in December 2005. Officer Avila then lost contact with Bobby Williams until Officer Avila located him in the Montgomery County Jail on February 22, 2006. Bobby Williams was in jail for violating his probation by not reporting as required.

Officer Avila arranged to meet with Bobby Williams that same day and showed him the four photo spreads prepared by Officer Chappell, as well as a fifth photo spread relating to a different murder investigation. From these photo spreads, Bobby Williams positively identified Malcolm Williams as the second man who entered the Flamingo Square apartment and Cornelius Clark as Jabo, the first man who entered the apartment that night.[5] Bobby Williams did not identify anyone in the photo spreads as the third, bigger man who had entered the apartment that night and discussed shooting Wilson and Liebetreu. Bobby

---

[5] The photo spreads eventually were admitted into evidence during appellant's trial as State's Exhibits 69 through 73. Bobby Williams recognized Malcolm Williams in Exhibit 69 and Clark in Exhibit 71. Bobby Williams did not recognize anyone in the remaining photo spreads, Exhibits 70, 72, and 73. Officer Avila testified that a photograph of appellant, who still had not yet been identified as a suspect, was not included in any of the five photo spreads.

7

Williams then told Officer Avila that he had seen the third man hanging out with the second man, Malcolm Williams, in the neighborhood. He offered to go with police into the neighborhood and point out some areas where they would hang out.

The next day, Bobby Williams rode with the police into his old neighborhood. Outside of Malcolm Williams's residence, among a large group of people hanging out, he noticed a man he was almost certain was the third man he had seen entering Jabo's apartment. The man was getting into a car. Officer Avila ran the car's license plate and obtained appellant's name as a person associated with the vehicle. Officer Avila then made a photo spread that contained appellant's Texas ID photo. This photo spread was admitted into evidence during appellant's trial as State's Exhibit 74.

On February 24, 2006, after appellant had become a suspect, Witness Avila and Christoffel were shown the photo spread containing appellant's photograph. Neither witness was able to identify appellant as the person they saw the night of the complainants' killings. That same day, Bobby Williams was shown the same photo spread. Bobby Williams positively identified appellant in that photo spread.

On March 8, 2006, the police arranged a live lineup using five men. Appellant was placed in the first position. Appellant was the only person in the lineup who was cleanly shaven. He also was the only person in the lineup who had appeared in any of the six photo spreads previously shown to Witness Avila and Christoffel. Witness Avila positively identified appellant as the African-American male he observed leaving Wilson's townhome. When asked to explain why he was able to positively identify appellant in the live lineup after he was unable to pick him out of a photo spread, Witness Avila attributed the difference to the fact that the lineup revealed appellant's height and overall size. Christoffel "tentatively" identified appellant from the lineup. Christoffel told the police it

8

was either appellant or the person in the number two position, but he "felt confident that [appellant] was the person based on his face."[6]

During trial, Bobby Williams identified appellant as the third man to enter the Flamingo Square apartment on the night of the murders who talked about shooting the complainants. There was no objection to this testimony.

During appellant's trial, Karen O'Bannion, an investigator for the Harris County District Attorney, testified regarding her participation in the investigation of the bloody footprints. O'Bannion measured appellant's foot size as well as his height. According to O'Bannion, appellant's foot measured larger than 15 1/2 and he stood six feet, seven inches tall.[7] Finally, O'Bannion recovered the shoes appellant was wearing in jail the day she measured his feet. O'Bannion testified the shoes were size 15. Appellant's shoes then were admitted into evidence.

William J. Bodziak, a forensic consultant specializing in the areas of footwear and tire impression evidence, testified for the prosecution. Bodziak testified the bloody footprints were made by a size 15 shoe. Bodziak testified that Reebok did not make the I3 pressure mid shoe in a size larger than size 15. Finally, Bodziak testified he received all of the measurements of appellant's feet taken by Investigator O'Bannion and, using those measurements, he determined that appellant's feet could fit inside a size 15 Reebok I3 pressure mid shoe.

---

[6] Only three witnesses viewed the lineup: Witness Avila, Dan Christoffel, and Coy Christoffel. Coy Christoffel viewed a videotape of the live lineup. Coy Christoffel, who was driving the night of the murders, picked out the third and fourth persons in the lineup. Officer Avila testified he was not surprised when Coy Christoffel did not pick appellant. According to Officer Avila, he believed Coy Christoffel was focused on driving and not the pedestrian they passed on the street that night.

[7] O'Bannion testified she used a Brannock Device to measure appellant's foot size. According to O'Bannion, this is the device commonly used in stores selling shoes to measure a customer's foot size. She further testified the maximum size measured by the Brannock Device is 15 1/2. O'Bannion testified she also drew an outline of appellant's feet and took an impression of them using a product called Bio-foam.

Carlos Rodriguez testified during appellant's trial. Rodriguez was incarcerated in the Harris County Jail while awaiting trial on charges of aggravated robbery and retaliation.[8] The retaliation charge was based on an allegation that he made a death threat against the victim in the aggravated robbery case. During his testimony, Rodriguez admitted he had been convicted of the misdemeanor charge of failure to identify himself to a peace officer in 2006 and he had been sentenced to serve three days in jail. Rodriguez had been incarcerated for about twenty months when he testified during appellant's trial.

Rodriguez had been housed in the same cell block with appellant while he was incarcerated. According to Rodriguez, anywhere from twenty to forty inmates would be housed in the same cell block. In February 2008, while the two men were waiting in a holding tank in the basement of the jail, appellant told Rodriguez about the crime he was charged with committing. According to Rodriguez, the two men were on their way back from court appearances. Appellant's case had been set for trial that day. Appellant told Rodriguez that he had committed the crime he was charged with but he believed he likely would beat the case because the prosecution did not have any evidence on him.

According to Rodriguez, appellant stated there were no witnesses and the prosecutors had the wrong shoe size. Appellant explained that his real shoe size was 16 and the State thought his shoe size was 15. Appellant also mentioned that the State had "a bloody half of a shoe print" and the print was from an Allen Iverson shoe. Appellant told Rodriguez he did own a pair of Allen Iverson shoes but he had gotten rid of them because there was blood on them. Appellant did not specifically tell Rodriguez that he was wearing the Allen Iverson shoes during the crime.

Rodriguez testified that appellant did not provide many details of the crime during their conversation. Appellant did mention the race of the victims: an older Caucasian

---

[8] Rodriguez testified that, if convicted on the aggravated robbery charge, he faced a sentence of five years to life in prison as well as a fine of up to $20,000. He also testified that if convicted on the retaliation charge, he faced a sentence of two to ten years in prison as well as a fine.

male and a younger Hispanic female.[9]   Appellant described the victims as looking like they had money.   Appellant mentioned the Galleria area when describing the victims. Appellant did not admit to being the shooter; instead he told Rodriguez a companion shot them while appellant was "looking for stuff."

Rodriguez said he had not discussed the case with any police investigators and he testified that he did not get any details about the crime from the Harris County District Attorney's office.   Rodriguez admitted that his cell block was equipped with a television and also received copies of the *Houston Chronicle* newspaper.   Despite that, Rodriguez denied that he had seen any news reports about Allen Iverson shoes and bloody shoe prints. According to Rodriguez, he learned everything he knew about the case from appellant. Rodriguez testified there had been no deals or promises made by the prosecutors in exchange for his testimony.   However, Rodriguez did admit that he hoped the judge in his cases would take his cooperation into consideration and he hoped to benefit from the fact he was testifying.

Appellant brought Dr. Roy Malpass, a professor of psychology at the University of Texas at El Paso, to testify as an expert on the subject of the reliability of the State's identification procedures.   The trial court conducted a *Daubert*[10] hearing outside the presence of the jury during which Dr. Malpass testified.   During the hearing, Dr. Malpass testified he was not there to testify about the accuracy of any particular witness's testimony.   Dr. Malpass also told the trial court that he did not "intend to tell [the jury] about the specific lineup or photospread."   Instead, Dr. Malpass intended "to discuss the way in which this was employed."   Dr. Malpass also informed the trial court that he

---

[9] The medical examiner's report described Wilson as a 40-year-old African-American female. Wilson's brother testified that Wilson was born in Nigeria.   The medical examiner's report described Liebetreu as a 43-year-old white male.   Photographs taken of both complainants at the charity ball, as well photographs of their bodies taken during the autopsies, were admitted into evidence.

[10] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

intended to testify "[t]hat the use of a photospread prior to gaining identification in a … physical lineup is a biasing factor against the Defendant."

During his testimony, Dr. Malpass also discussed studies addressing eyewitness identifications involving photo spreads and lineups.  According to Dr. Malpass, while he was familiar with more than thirty such studies, he had not personally conducted any of them.  When asked if there were scientific studies addressing the suggestive nature of a police procedure where a witness is driven through a neighborhood and identifies an individual that "would seem to be the assailant and then is taken back to the police station and shown a lineup with that person's picture in it," Dr. Malpass answered: "[N]ot specifically about that particular configuration."

Dr. Malpass also informed the trial court that he had participated in the creation of the Department of Justice's publication "Eyewitness Evidence, a Guide for Law Enforcement," and that this guide would not approve of a procedure where an eyewitness is shown a photo spread before being asked to then make an identification in a live lineup. However, when asked on cross-examination to point out in the guide where it says law enforcement personnel should not use the challenged procedure, Dr. Malpass was unable to do so.  Dr. Malpass also testified that he was not present during the testimony of Witness Avila or Dan Christoffel.  When asked by the prosecutor if he had been asleep during much of the testimony of Officer Avila, Dr. Malpass denied that he had been asleep.

Following Dr. Malpass's testimony, the trial court noted for the record that (1) Dr. Malpass admitted that he had not been present for the testimony of the eyewitnesses in the case; (2) Dr. Malpass had not done any studies regarding a lineup following a photo spread; and (3) despite testifying that the Department of Justice publication "Eyewitness Evidence, a Guide for Law Enforcement," advised against using an identification procedure that involved a photo spread followed by a lineup, Dr. Malpass, when given time to do so, was unable to point out the location of that particular advice in the guide.  Finally, the trial judge noted that, after he had been informed that it was essential to the formation of Dr.

Malpass's opinion and testimony that Dr. Malpass be allowed to sit through the trial, the judge had observed Dr. Malpass sleeping several times during the trial. The trial court concluded that Dr. Malpass's opinion and projected testimony based on that opinion would not be relevant and excluded him from testifying.

Following the close of the evidence, the jury found appellant guilty of capital murder. The trial court assessed the automatic punishment of confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Appellant then appealed his conviction to this court.

In the original appeal to this court, appellant argued the trial court abused its discretion when it excluded Dr. Malpass's testimony. *Tillman v. State*, No. 14-08-00846-CR, 2010 WL 2103938, at *3 (Tex. App.—Houston [14th Dist.] May 27, 2010) (mem. op., not designated for publication) *rev'd*, 354 S.W.3d 425, 443 (Tex. Crim. App. 2011). We affirmed the trial court's exclusion of Dr. Malpass's testimony, holding:

> As demonstrated above, Dr. Malpass demonstrated no knowledge of the facts of this case and made no effort to connect his opinion with those facts. Instead, Dr. Malpass's opinion testimony was offered only as general educational material for the jury. Because Dr. Malpass's opinion testimony was not tied to the facts of the case, we conclude it would not help the jury understand other evidence or determine a fact at issue and therefore was not relevant. [internal citation omitted] Accordingly, we hold the trial court's decision to exclude Dr. Malpass's testimony was within the zone of reasonable disagreement and overrule appellant's first issue.

*Tillman*, 2010 WL 2103938, at *5.

Appellant filed a petition for discretionary review in the Court of Criminal Appeals of Texas. The Court of Criminal Appeals granted the petition "to address whether the court of appeals erroneously decided that the trial court properly excluded the eyewitness-identification testimony of Appellant's proffered expert (Malpass) because the psychologist 'demonstrated no knowledge of the facts of this case and made no effort to connect his opinion with those facts.'" *Tillman*, 354 S.W.3d at 434. Examining the

13

testimony of two eyewitnesses—Witness Avila and Dan Christoffel—the Court of Criminal Appeals determined that Dr. Malpass's proposed testimony was relevant and "could have aided the jury by either validating or calling into question their own inclinations." *Id.* at 442. The Court of Criminal Appeals reversed this court's judgment and remanded the case for a harm analysis. *Id.* at 443.

## DISCUSSION

In a criminal case, harm is evaluated under Texas Rule of Appellate Procedure 44.2. Constitutional error is analyzed under Rule 44.2(a), while non-constitutional error is analyzed under Rule 44.2(b). Tex. R. App. P. 44.2. Therefore, we must decide initially whether the trial court's error in excluding Dr. Malpass's testimony was, as appellant argues in his supplemental brief on remand, of constitutional proportions because it "effectively prevented [him] from presenting a meaningful defense."

The erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error and is reviewed under Rule 44.2(b). *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). However, in Texas, the improper exclusion of evidence may raise a constitutional violation in two circumstances: (1) when an evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes evidence that is vital to the case, and the exclusion precludes the defendant from presenting a defense. *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005). Only the second circumstance is at issue here. The Court of Criminal Appeals has noted that erroneous evidentiary rulings rarely rise to the level of denying a fundamental constitutional right to present a meaningful defense. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002). A constitutional violation arises only where the trial court's clearly erroneous ruling excludes otherwise relevant, reliable evidence forming such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense. *Id.*

14

We conclude that the excluded testimony would have furthered appellant's defensive theory only incrementally.   *See Walters*, 247 S.W.3d at 222; *see also Ray*, 178 S.W.3d at 836.   Because appellant was able to challenge the reliability of the police identification procedures through cross-examination of the eyewitnesses and Officer Avila, and attacked their reliability during closing argument, we conclude he was not effectively prevented from presenting his defense when the trial court excluded Dr. Malpass from testifying.   *See Perry v. New Hampshire*, 132 S.Ct. 716, 723 (2012) ("Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel; compulsory process; and confrontation plus cross-examination of witnesses." (citations omitted)); *Walters*, 247 S.W.3d at 222 (error was not of constitutional dimension because the erroneously excluded evidence would have only incrementally furthered the appellant's defensive theory); *Ray*, 178 S.W.3d at 836 (same).   Thus, under existing case law, we conclude that the trial court's error in excluding Dr. Malpass's expert testimony was not of constitutional dimension and the harm analysis is governed by Rule 44.2(b).   *Walters*, 247 S.W.3d at 222; *Ray*, 178 S.W.3d at 836; *Potier v. State*, 68 S.W.3d 657, 662–63 (Tex. Crim. App. 2002).

Appellant misplaces his reliance on *Stephenson v. State*, 226 S.W.3d 622, 628–29 (Tex. App.—Amarillo 2007, no pet.), in arguing that a constitutional violation occurred here.   *Stephenson* is not binding on this court; in any event, it is distinguishable. *Stephenson* held that when the State presented no evidence tying the defendant to the crime other than the victim's identification of the defendant, the trial court's erroneous exclusion of a defense expert's testimony pertaining to the reliability of eyewitness identification of suspects was of constitutional proportions and must be analyzed under Rule 44.2(a). *Stephenson*, 226 S.W.3d at 628.   That is not the situation we are presented with here.   In addition to the testimony of the two crime scene eyewitnesses, the State presented testimony from Bobby Williams and Carlos Rodriguez, as well as the bloody footprint evidence.   Because the facts are distinguishable, we conclude the analysis in *Stephenson* does not inform our analysis in this case.

15

A non-constitutional error that does not affect substantial rights does not justify overturning the verdict. *Potier*, 68 S.W.3d at 666. A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). If the error did not influence the jury, or had only a slight effect, the error is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). An appellate court should consider everything in the record to determine the likelihood the jury's decision was affected by the error. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). This includes such factors as evidence and testimony admitted to the jury's consideration, the nature of the evidence supporting the verdict, the character of the error, and how the error may be considered in connection with other evidence in the case. *Id.* We also may consider jury instructions, both parties' theories of the case, closing arguments, and whether the State emphasized the error. *Id.*

The Court of Criminal Appeals's opinion focuses primarily on Dr. Malpass's proposed testimony that "the use of a photospread prior to gaining identification in a … physical lineup is a biasing factor against the Defendant." The police followed this particular procedure only with two eyewitnesses: Witness Avila and Dan Christoffel. *See Tillman*, 354 S.W.3d at 428–30, 442 ("However, the jury in this case should have had the benefit of Malpass's testimony here because eyewitness identification was crucial to the State's case, and … we believe that the identification procedure employed (in particular that used with witnesses Avila and Christoffel) was not usual."). Abundant additional evidence tied appellant to the crime.

Witness Avila met with a police sketch artist who prepared a sketch of the man Witness Avila saw leaving Wilson's townhome. This sketch was prepared before Witness Avila was shown any photo spreads containing appellant's photograph or viewed the live lineup in which appellant was a participant. The sketch was admitted into evidence, as were photographs taken of appellant near the time of the killings. In addition, appellant

16

was present in the courtroom throughout his trial. The members of the jury thus were able to compare the sketch to appellant and the photographs of appellant, and then determine for themselves whether the police artist's sketch resembled appellant.[11]

The testimony of Carlos Rodriguez, appellant's cell mate at the Harris County Jail, also bears on the harm analysis. Rodriguez testified that appellant stated he was "looking for stuff" when a cohort shot the complainants. The testimony of Officer Avila revealed that Rodriquez knew details of the crimes that could have been learned only from someone present during the killings or participating in the investigation. There was no allegation Rodriguez's testimony was tainted by allegedly improper police identification procedures. The fact Rodriguez was accused of two crimes and was hoping to benefit from his testimony does not neutralize Rodriguez's testimony for purposes of the harm analysis. This information was introduced into evidence and the jury was therefore able to consider it when evaluating Rodriguez's credibility.

The bloody shoe print evidence found at the scene also connects appellant to the crime. Expert testimony established that the shoe print was made by a size 15 Reebok I3 pressure mid shoe associated in the retail marketplace with basketball player Allen Iverson. The evidence revealed that appellant had uniquely large feet, measuring off the Brannock Device. Expert testimony established that, despite measuring larger than size 15, appellant's feet would fit inside size 15 Reebok I3 pressure mid shoes. Rodriguez's testimony established that appellant had owned a pair of Reebok Allen Iverson shoes, but had thrown them away because they had gotten blood on them. Finally, the evidence demonstrated that there were a myriad of factors that would motivate a person to buy shoes smaller than the measured size of that person's foot. Among these was the lack of

---

[11] Dr. Malpass's proposed testimony involved a hypothetical based on Witness Avila's participation with the police sketch artist. This proposed testimony did not address the accuracy of the sketch itself or situations where corroborating evidence beyond the identification resulting from the challenged eyewitness identification procedures implicates the person involved in the sketch artist's drawing, the lineup, and the photo spread.

17

availability of the larger sizes in local stores and the cost of obtaining the proper size through the internet.

We also consider Bobby Williams's testimony. Bobby Williams was present in an apartment at the Flamingo Square Apartments when three African-American males entered, two of them armed. All three walked by Bobby Williams in the well-lighted kitchen of the apartment. Once in the living room, the three men started talking to another African-American male already present in the apartment's living room. Bobby Williams heard appellant describe the robbery and killings. After leaving the apartment, Bobby Williams reported what he had learned to Crime Stoppers. Bobby Williams was eventually contacted by the police and he accompanied investigators into the neighborhood where he had seen the third male hanging out with Malcolm Williams. Bobby Williams was able to identify appellant during that drive with the police. Later, Bobby Williams identified appellant in a photo spread and made an in-court identification of appellant. Bobby Williams's status as a Crime Stoppers tipster and his hope that he would receive a reward for making that tip were introduced into evidence, and the jury was able to consider this evidence when evaluating his credibility.

Dr. Malpass's proffered testimony only minimally addressed Bobby Williams's testimony because police investigators did not have Bobby Williams view a lineup after showing him the photo spread containing appellant's photograph. During his proffered testimony, Dr. Malpass stated that he was not going to testify about the accuracy of any particular witness's testimony and he admitted there were no scientific studies specifically addressing the identification procedure used with Bobby Williams.

In addition, the Court of Criminal Appeals's opinion mentions the police procedures used with Bobby Williams only in passing: "Still another hypothetical [discussed by Dr. Malpass] paralleled the identification procedures used with [Bobby] Williams — it

18

described a drive-by identification of a suspect, followed by a live lineup."[12] *Tillman*, 354 S.W.3d 425, 439. The Court of Criminal Appeals's opinion does not mention the Bobby Williams identification procedures again. Instead, the opinion focuses on the identification procedures used with Witness Avila and Dan Christoffel:

> [T]he jury in this case should have had the benefit of Malpass's testimony here because eyewitness identification was crucial to the State's case, and regardless of the suggestions made by the State, we believe the identification procedure employed (in particular that used with witnesses Avila and Christoffel) was not usual. A total of six separate photo spreads were shown to the witnesses, each showing six persons. Appellant was in the last of the photo spreads. Neither witness could identify Appellant in the six photo spreads. Just twelve days later, the witnesses viewed a live line-up. Of the five individuals in the lineup, Appellant was the only one who had been in the previously viewed photo spreads, and Appellant was the only one who was cleanly shaven. Witness Avila identified Appellant, but Christoffel could only tentatively identify him. This procedure was out of the ordinary, as it involved many layers of suggestiveness. Consequently, in this case, it was imperative that the jury be exposed to the full spectrum of possible implications resulting from that suggestiveness in order to have a full understanding of the subject.

*Id.* at 442. This passage indicates that the Court was focused primarily on procedures used with Witness Avila and Dan Christoffel, and not on those used with Bobby Williams.

During closing argument, appellant's defense counsel addressed the eyewitness identifications at length. Appellant's counsel argued that the use of a photo spread containing appellant's photograph prior to a lineup where appellant was the only common

---

[12] The Court of Criminal Appeals suggested that Bobby Williams participated in a live lineup involving appellant following his drive-by identification. *See Tillman*, 354 S.W.3d at 439 ("Still another hypothetical paralleled the identification procedures used with Williams — it described a drive-by identification of a suspect, followed by a live lineup."). The record does not support such a suggestion. The testimony establishes that, after his drive-by identification, Bobby Williams was shown a photo spread containing appellant's Texas ID photograph; Bobby Williams did not view a live lineup or a videotape of a live lineup. Officer Avila testified that only Witness Avila, Dan Christoffel, and Coy Christoffel viewed a lineup. While standing in separate rooms, Witness Avila and Dan Christoffel viewed the same live lineup with appellant in the number one position. Coy Christoffel viewed a videotape of the same live lineup viewed by Witness Avila and Dan Christoffel.

participant tainted any resulting identification. In response, the State spent much of its final argument addressing the evidence corroborating the identifications made by Witness Avila, Dan Christoffel, and Bobby Williams.

On this record, we hold the exclusion of Dr Malpass's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict. At most, the error had only a slight effect. Therefore, the trial court's exclusion of Dr. Malpass's testimony was harmless. *See Lucio v. State*, 351 S.W.3d 878, 901 n.25 (Tex. Crim. App. 2011) (in light of other evidence of guilt, error in excluding expert's opinion was harmless error under Rule 44.2(b)).

We conclude the result would be the same even under the more stringent harm analysis required by Rule 44.2(a). A case with constitutional error must be reversed unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a). This analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We must evaluate the entire record in a neutral, impartial, and even-handed manner. *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989). The presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error under Rule 44.2(a). *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002) (citing *Wesbrook*, 29 S.W.3d at 119). An analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether, beyond a reasonable doubt, the error did not contribute to the conviction or punishment. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). Having evaluated the entire record in a neutral light, we conclude that a rational trier of fact would not have reached a different result if the error had not occurred and Dr. Malpass had been allowed to testify.

## CONCLUSION

We hold that the trial court's erroneous exclusion of the testimony of Dr. Malpass was harmless.   Accordingly, we affirm the trial court's judgment.


/s/      William Boyce
Justice


Panel consists of Chief Justice Hedges, and Justices Frost and Boyce.

Publish — TEX. R. APP. P. 47.2(b).

21