**Memorandum Opinion of January 22, 2014 Withdrawn; Reversed and Remanded and Corrected Memorandum Opinion filed January 22, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-00957-CR

**CORREY OLIVER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1346323**

## C O R R E C T E D   M E M O R A N D U M   O P I N I O N

This court withdraws its memorandum opinion dated January 22, 2014, and issues a corrected memorandum opinion in its place to include the correct date of issuance, January 22, 2015. We also issue a corrected judgment dated January 22, 2015, to correct the clerical mistake.

The State indicted appellant Correy Oliver for (1) the possession with intent to deliver cocaine weighing 400 grams or more[1] and (2) the possession with intent to deliver a compound, mixture, or preparation containing not more than 200 milligrams of codeine per 100 milliliters of non-narcotic active medicinal ingredients weighing 400 grams or more.[2] The trial court directed a verdict of not guilty on the codeine charge, and the jury found appellant guilty on the cocaine charge. The court sentenced appellant to an agreed punishment of forty-five years' confinement.

Appellant contends the trial court reversibly erred by denying his motion to suppress evidence discovered as a result of the warrantless search of his cell phone. We reverse the trial court's judgment and remand for a new trial.

### WARRANTLESS SEARCH OF CELL PHONE

In his first issue, appellant contends the trial court reversibly erred by denying his motion to suppress evidence of a text message on appellant's cell phone, which a police officer found during a warrantless search of the phone. The State contends the search was justified by exigent circumstances—"to avoid the imminent destruction of evidence"—and that in any event, the error was harmless. We hold that the trial court erred by admitting evidence of the text message, and we must reverse the trial court's judgment because we cannot determine beyond a reasonable doubt that the error did not contribute to appellant's conviction.

### A. Standard of Review

We apply a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing de novo the court's

---

[1] *See* Tex. Health & Safety Code Ann. §§ 481.102(3)(D), 481.112(f).

[2] *See* Tex. Health & Safety Code Ann. §§ 481.105(1), 481.114(e).

application of the law of search and seizure under the Fourth Amendment. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We view the evidence in the light most favorable to the trial court's ruling, and we assume that the trial court made implicit findings of fact supported in the record that buttress the court's conclusion. *Id.* at 328. Unless it would be a manifest injustice, we will affirm a trial court's ruling on a motion to suppress if it is correct under any theory of law that is applicable to the case. *State v. Esparza*, 413 S.W.3d 81, 89–90 (Tex. Crim. App. 2013).

**B.    Law Regarding Search of Cell Phones**

While this appeal was pending, the United States Supreme Court held that under the Fourth Amendment's prohibition of unreasonable searches, a person's cell phone may not be searched incident to arrest. *Riley v. California*, 134 S. Ct. 2473, 2494 (2014). Generally, a cell phone may be seized incident to arrest, but police must get a warrant to search it. *Id.* at 2495. One exception to the warrant requirement, however, is "when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 2494 (quotation omitted; alteration in original). One such exigency could be "the need to prevent the imminent destruction of evidence." *Id.* Another could be the need to assist persons who are "threatened with imminent injury." *Id.* (citing as examples "a suspect texting an accomplice who, it is feared, is preparing to detonate a bomb or a child abductor who may have information about the child's location on his cell phone"). The State has the burden to establish that an exigency existed; if the State does not, "then a warrantless [search] will not withstand judicial scrutiny." *Gutierrez v. State*, 221 S.W.3d 680, 685–86 (Tex. Crim. App. 2007).

3

## C. Evidence Regarding the Search and Exigent Circumstances

Houston Police Department Officer Andrew Wright stopped a car driven by Michael Floyd. Appellant was a passenger in the front seat. The car was registered to appellant and his girlfriend. In plain view in the front cup-holder area of the car, Wright saw a prescription bottle, a bottle of red Sunkist soda, and two Styrofoam cups with ice. Wright believed the prescription bottle contained codeine cough syrup because people who drink it commonly mix it with fruity red soda.[3] Floyd consented to a search of the vehicle, and appellant did not object. Wright and another officer detained Floyd and appellant in separate vehicles.

Wright testified that he observed appellant touching the buttons on an open, flip-style cell phone, so he took the phone from appellant and put in in a patrol car where it "would be difficult for him to get." The search of the vehicle revealed a bag behind the driver's seat containing 654 grams of cocaine and multiple bottles of codeine cough syrup. After Wright arrested appellant, Wright searched the phone "incident to arrest."[4]

---

[3] At some point, Wright examined and smelled the bottle, and he opined that the bottle contained codeine.

[4] Wright testified,

Q [the State]. At that point, without going into details, did you search the cell phone that Correy Oliver had on him?
A. Yes, I did.
Q. Was that a search incident to arrest?
A. Yes, it was.
. . . .
Q [defense counsel]. And you did that—once you arrested Mr. Oliver, you just searched it incident to arrest?
A. That's correct.
. . . .
Q [the State]. And after you had Correy Oliver, this defendant, under arrest, did you search that phone search [sic] incident to arrest?
A. Yes, I did.

4

Wright did not testify that an exigency caused him to search the phone. Wright testified that once the phone was seized, appellant did not have any opportunity to try to take the phone back or do anything with the phone. Wright also testified that he could have disabled the phone and obtained a warrant:

Q. Okay. Flip phones are sort of older technology. Do you think—you could have figured out how to turn this phone off pretty easily, right?

A. Probably just take out the battery.

Q. Exactly. And that disables the phone, correct?

A. Right.

Q. Sometimes phones have cards or something that you can take out as well, correct?

A. Right.

Q. Okay. All of that would have stopped the phone from doing anything, from being a phone at all, correct?

A. Yes.

. . . .

Q. There was nothing preventing you from getting a warrant?

A. No, there was not.

Q. Turning off the phone would have disabled it so that nothing could have happened to it between the time you got the warrant and were able to search it?

A. Yes.

Wright testified that he found a text message sent to appellant, and Wright took a picture of it. Over appellant's objection, the trial court admitted this picture—Exhibit 7—as evidence. The text message reads, "U got some oil[.]" Wright testified that "oil" is slang for codeine cough syrup. And although there is no punctuation, Wright testified that based on his training and experience, the text message indicated, "Someone was asking him if he had any codeine syrup."

5

## D.    Error to Admit Text Message

The State contends the trial court could have found that exigent circumstances justified the warrantless search of appellant's cell phone because of the need "to avoid the imminent destruction of evidence."  The State acknowledges Wright's testimony that the phone could have been disabled, but the State argues that disabling the phone "did not mean that the deleted items would remain recoverable or that it could later be reinstated to a working phone with the information intact."  The State contends that "appellant proffered no evidence that [disabling the phone] would have retained the information already deleted or rendered the phone operational when the officer later replaced the [SIM card or battery]."  Ultimately, the State contends,

> The lack of knowledge about what disabling the phone would do, or even closing the opened flip phone he held (much less removing the memory card) could do to it, along with appellant's manipulations of the phone, created exigent circumstances from which the trial court could conclude the search was immediately necessary to prevent the destruction of evidence.

Initially, we note that it was the *State's* burden to prove exigency, not appellant's burden to prove a lack of exigency.  *See Gutierrez*, 221 S.W.3d at 685–86.  Accordingly, the lack of evidence in this record concerning Wright's knowledge about the effects of disabling the phone does not help prove that exigent circumstances existed.

Regardless, the Supreme Court addressed some of the State's practical concerns in *Riley*. The Court noted that "once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone."  134 S. Ct. at 2486.  Here, Wright acknowledged that appellant had no opportunity to delete data from the

6

phone after Wright seized it. Further, the Supreme Court explained that if an officer seizes a phone in an unlocked state, as Wright did, the officer may be able to disable a phone's locking feature to prevent locking and the encryption of data. *See id.* at 2487. An officer can prevent a remote wipe of the phone's data by "disconnecting a phone from the network" in at least two simple ways: turning the phone off or removing the battery. *Id.* So, under appropriate circumstances, officers may take measures to preserve data on a phone without resorting to searching it. *See id.* The Supreme Court's "answer to the question of what police must do before searching a cell phone seized incident to arrest is accordingly simple—get a warrant." *Id.* at 2495.

Here, the trial court did not find that exigent circumstances justified the warrantless search of appellant's cell phone, and based on this record, no rational jurist could so find. Wright testified multiple times that he searched the phone "incident to arrest," and there was "nothing" preventing him from getting a warrant. Appellant had no opportunity to delete data himself once the phone was seized, and "[t]urning off the phone would have disabled it so that nothing could have happened to it between the time [Wright] got the warrant and [would have been] able to search it." Wright never testified about any of the concerns that the State now raises for the first time on appeal.[5]

---

[5] For the first time at oral argument, the State suggested that exigent circumstances existed because appellant and Floyd were "calling their posse to the scene, . . . actively seeking to have people come and complicate an arrest situation." Although courts have recognized exigent circumstances for the purpose of "protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous," *Gutierrez*, 221 S.W.3d at 685, Wright never testified that he searched the phone in an attempt to gain information that would help protect himself or others from harm. In fact, he testified that he was not in fear for his safety, and there were no circumstances regarding the phone that he found scary or harmful to himself. "Nothing" prevented Wright from obtaining a warrant. Accordingly, the State failed to adduce evidence of exigent circumstances based on an alleged desire for Wright to protect himself or others from danger.

Accordingly, the trial court erred by admitting the evidence gathered from the warrantless search of appellant's cell phone.

## E.     Harm

Appellant and the State agree that this error is constitutional, and therefore, we must reverse appellant's conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction." Tex. R. App. P. 44.2(a). This standard for determining harmful error "should ultimately serve to vindicate the integrity of the fact-finding process rather than simply looking to the justifiability of the fact-finder's result." *Snowden v. State*, 353 S.W.3d 815, 819 (Tex. Crim. App. 2011).

Accordingly, we must focus "not upon the perceived accuracy of the conviction or punishment, but upon the error itself in the context of the trial as a whole, in order to determine the likelihood that it genuinely corrupted the fact-finding process." *Id.* We focus not on "whether the jury verdict was supported by the evidence," but rather, on whether "the error adversely affected the integrity of the process leading to the conviction." *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (quotation omitted). We must "focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *overruled on other grounds by Snowden*, 353 S.W.3d at 821–22; *accord Daniels v. State*, 25 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

So, an error is not harmless "simply because the reviewing court is confident that the result the jury reached was objectively correct." *Snowden*, 353 S.W.3d at 819. Error is not harmless "if there is a reasonable likelihood that it materially affected the jury's deliberations." *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim.

App. 2008). Nor is error harmless if it "disrupted the jury's orderly evaluation of the evidence." *Walker v. State*, 180 S.W.3d 829, 835 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Harris*, 790 S.W.2d at 588).

To determine whether constitutional error was harmless, we must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Neal*, 256 S.W.3d at 284. Accordingly, the presence of "overwhelming evidence of guilt is a factor to be considered." *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002). Other factors to consider may include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden*, 353 S.W.3d at 822. These are not exclusive considerations or even necessary considerations in every case. *See id.* "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (alteration in original) (quoting Tex. R. App. P. 44.2(a)). We examine the entire record "in a neutral, impartial and even-handed manner and do not make our examination 'in the light most favorable to the verdict.'" *Daniels*, 25 S.W.3d at 899 (quoting *Harris*, 790 S.W.2d at 586); *see also Tillman v. State*, 376 S.W.3d 188, 202 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

We begin the analysis by reviewing the evidence of appellant's guilt. The evidence of appellant's possession with intent to deliver cocaine, viewed in isolation, was strong indeed: (1) a secretly recorded conversation between appellant and Floyd demonstrated appellant's knowledge of the presence of the cocaine when he told Floyd there was "about a half" of a kilogram of cocaine in

the car; (2) appellant had over $1,100 in small denomination bills on him at the time of the arrest, which indicated to Wright that appellant was "selling small quantities of narcotics or making change for other people buying"; (3) the car was registered to appellant and his girlfriend, not Floyd; (4) the cocaine was within easy reach of appellant, having been found in a bag behind the driver's seat; (5) the cocaine weighed 654 grams and was worth about $60,000 on the street; (6) appellant was linked to several bottles of codeine cough syrup found in the same bag as the cocaine because a bottle of codeine was in plain view in the front seat, and the officers found a six-month-old prescription for codeine cough syrup in appellant's name in the car; and (7) after appellant was informed he was being arrested for possession of cocaine and codeine and was told his money would be seized, appellant said, "I'm going to keep doing what I do no matter what you do," which Wright understood as, "He's going to keep selling drugs and trying to make money no matter if he gets arrested and charged."[6]  However, the evidence was sharply controverted by Floyd's purposeful, self-incrimination.  Floyd gave a recorded, Mirandized statement to Wright that he had borrowed the car from appellant the night before, that all the drugs were Floyd's, and that he put the drugs in the car before picking up appellant. [7]

---

[6] This statement may be a "persuasive admission of personal involvement," but it is not necessarily an "explicit admission of guilt."  *See Hutchinson v. State*, 424 S.W.3d 164, 184 (Tex. App.—Texarkana 2014, no pet.) (referencing a statement made by a defendant after he was detained and told he would be arrested and his house searched, "I've just been doing what I've been doing for a little extra money"; reversing for constitutional error despite "relatively strong" evidence linking the defendant to 11.58 grams of methamphetamine, 32.51 grams of GHB, and some Xanax pills; evidence included the admissible statement quoted above, the defendant had $1,600 in cash on his person, he lived at the residence where drugs were found, he gave keys to police officers that unlocked his bedroom where the officers found the drugs; the State twice referenced appellant's second, inadmissible statement during closing arguments).

[7] The State undermined Floyd's confession with evidence that it was contrived and instigated by appellant.  Before Floyd confessed, the officers had placed appellant and Floyd in the back of a patrol car together where their conversation was secretly recorded.  Although

10

Thus, the evidence of appellant's possession with intent to deliver the cocaine was not overwhelming. Courts have considered several factors for measuring the weight of the evidence concerning an intent to deliver a controlled substance, such as: (1) the nature of the location at which the accused was arrested (whether an area known for drug dealing); (2) the quantity of contraband in the accused's possession; (3) the manner of packaging (whether packaged in individual units for resale); (4) the presence or lack thereof of drug paraphernalia (whether for use or sale); (5) the accused's possession of large amounts of cash (particularly in amounts indicative of drug sales); and (6) the accused's status as a drug user. *See Moreno v. State*, 195 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *see also Carter v. State*, 419 S.W.3d 1, 18 (Tex. App.—Amarillo 2009), *rev'd on other grounds*, 309 S.W.3d 31 (Tex. Crim. App. 2010).

The State contends that the "sheer volume" of cocaine was "sufficient evidence to demonstrate appellant's intent to deliver." But the test is not merely one of weight or sufficiency; we are concerned with the likelihood that the admission of the text message corrupted the fact-finding process, affected the integrity of the process leading to the conviction, or prejudiced the jurors' decision-making. *See Snowden*, 353 S.W.3d at 819; *Langham*, 305 S.W.3d at 582; *Harris*, 790 S.W.2d at 586.

---

appellant and Floyd were "talking pretty quiet" and "mumbling" according to Wright, Wright identified appellant as saying "I got you." Appellant also said, "I can't go down," and, "You would get probation." Floyd asked, "How much work was in that [expletive]," and appellant responded, "About a half." (Testimony at trial established that "work" is slang for cocaine.) Appellant then said, "I got you, though . . . . When you dropped me off last night, you put it in there. You hear me?" Floyd said, "I got you." Appellant and Floyd then used a different cell phone (unbeknownst to the police officers at the time) to call someone. Appellant told Floyd, "Just tell them everything," and Floyd said, "I got you, I got you." Floyd told someone on the phone, "All that [expletive] was mine that I had with us," and Floyd said he had "a half of a whole." Floyd said he was going to tell the police "it was mine."

11

In considering the remaining evidence, or lack thereof, about possession with an intent to deliver, we note that there was no evidence that Floyd and appellant were stopped in an area known for drug dealing although the area was "high crime." The cocaine was not packaged in individual units for resale, nor was there any evidence of other drug-distribution paraphernalia found in appellant's car (or any other location) that would have indicated an intent to deliver, such as baggies or measuring devices. Accordingly, the evidence of guilt was not overwhelming. *See Carter*, 419 S.W.3d at 18 & n.19 (reasoning that, other than the defendant's confession, there was "virtually no evidence" establishing the defendant's intent to deliver; holding error harmful when there were 491 grams of cocaine found in a vehicle with a passenger and a driver, and there was no evidence the defendant possessed an excessive amount of cash, that the cocaine was packaged in a manner indicating an intent to sell, that the defendant possessed any baggies, scales or other items used in drug transactions, that the defendant was arrested in an area known for drug sales, that the defendant had any weapons in the car, or that the defendant attempted to flee).[8]

Further, there was drug paraphernalia indicative of appellant's personal use of the codeine cough syrup. Wright testified that he observed a small prescription bottle of codeine in appellant's name, two cups of ice, and a red fruity beverage bottle in the front cup-holder area of the car. These items were consistent with drug *use* according to Wright: "Typically they will mix the codeine with some kind of fruity soda beverage, and a lot of times they choose a fruity beverage that is red

---

[8] Viewing the record in a neutral light, we disagree with the State's contention on appeal that "the appearance of the cocaine indicated it was meant to be delivered to someone else rather than possessed for appellant's own use." The State cites Wright's testimony that the cocaine was "straight off the brick" and "not broken up or diluted in any way." But Wright did not opine that this appearance indicated an intent to deliver. Such an intent perhaps could have been shown if the cocaine *had* been broken up into smaller quantities and diluted, ready for resale.

so that the color won't have changed that much if you pour codeine in it." The State elicited Wright's opinion, based on his training and experience, that the text message indicated, "Someone was asking him if he had any codeine syrup." Thus, the text message and Wright's opinion provided evidence that appellant was a drug dealer, rather than merely a drug user.

Despite the trial court directing a "not guilty" verdict on the codeine charge, the State relied on the text message during closing argument. First, the State rebuffed defense counsel's suggestion that the text message was not incriminating, arguing:

> You got oil. I guess he works for BP. I mean, my goodness, if you've got—if your car is low on oil and you need some, just text [appellant]. He'll get it for you. No problem. Come on. You know, it's common sense. What did Officer Wright tell you was one of the nicknames of codeine? Oil. Doesn't take a rocket scientist to figure it out.

After referencing the amount of cocaine appellant possessed, the State argued, "You want to tell me that's not intent to deliver? You got oil. Unfortunately there's nothing else we can bring you other than that, and it's enough." Accordingly, the State invited the jury to infer that because appellant intended to deliver codeine, he also intended to deliver the cocaine found in the same bag as the codeine.

On appeal, the State contends the "oil" text was of little significance because it contained no punctuation and there was "no clear indication that it referred to codeine." But that argument directly contradicts the State's evidence and its argument to the jury at the close of the case. Further, the State contends that the State mentioned the text during closing argument "only after defense counsel chose to mention it" first. But defense counsel's attempt during closing argument to lessen the impact of the inadmissible evidence does not mean appellant suffered

any less harm—in fact, it cuts the other way because a "probable implication" or "collateral consequence" of error in the admission of evidence is naturally that defense counsel will attempt to mitigate the effect of harmful, relevant evidence during closing argument. *See Hutchinson v. State*, 424 S.W.3d 164, 182, 184 (Tex. App.—Texarkana 2014, no pet.) (noting that courts must consider "probable collateral consequences" of the error) (citing *Snowden*, 353 S.W.3d at 822; *Higginbotham v. State*, 807 S.W.2d 732, 737 (Tex. Crim. App. 1991)). That both the State and defense counsel discussed the inadmissible evidence suggests the error might possibly have prejudiced the jurors' decision-making or disrupted the jury's orderly evaluation of the evidence. *See Harris*, 790 S.W.2d at 586, 588.

In sum, the text message helped the State paint a clearer picture of appellant's possession with intent to deliver cocaine, and that is precisely the argument the State made to the jury. The text message connected appellant, as opposed to Floyd, to the distributable quantity of cocaine and a cell phone solicitation for distribution. The text message was "important in the context of the entire trial." *See Cabrales v. State*, 932 S.W.2d 653, 657–59 (Tex. App.—Houston [14th Dist.] 1996, no writ) (reversing the defendant's conviction under the beyond-a-reasonable-doubt harm analysis when an officer improperly testified that the cocaine could be cracked out and worth $60 million whereas the powder cocaine appellant was charged with possessing with intent to deliver was worth only $15 million; the defendant was the passenger in a vehicle driven by another person, wherein officers found four locked duffle bags containing 78 packages of cocaine weighing about 150 kilograms; the defendant had engaged in activity consistent with drug activity, i.e., keeping a lookout after the drugs were presumably loaded into the vehicle, and the defendant "directed the officers to the hidden keys which unlocked the bags" of cocaine; this court found harm because the evidence was

14

"important in the context of the entire trial," where the State had argued that the defendant knew "what was going on" based on the fact that the vehicle contained drugs worth up to $60 million).[9]

The sole case the State cites in support of its argument on harm is *Neal v. State*, where the Court of Criminal Appeals held that the admission of a gun and Blockbuster card did not contribute to Neal's conviction for capital murder. *See* 256 S.W.3d at 284. The case is inapposite. Neal had confessed to raping and murdering the victim. *Id.* at 277. Cruz, the accomplice, testified about the rape and murder "in great detail at trial, from the conception of their plan through its execution, as well as the aftermath in which she confessed to the police and led them to [the] body." *Id.* Neal also gave a general account of the rape and murder to his cellmate. *Id.* The evidence presented a "clear picture" that appellant abducted the victim, stole some of her valuables, raped her, and fatally shot her several times. *Id.* Fingerprint and DNA evidence linked him to the crime. *Id.* The inadmissible gun was not the murder weapon, but Cruz had used it to hold-up the victim. *Id.* at 283. At trial, the State had Cruz demonstrate how she held the gun. *Id.* The Court of Criminal Appeals found the admission of the gun and Blockbuster card harmless because, although the examination of Cruz regarding the gun "may have added a dramatic flourish at trial," the testimony was brief, the evidence of Neal's guilt was overwhelming, the handgun was not essential to the State's case, and the Blockbuster card "was of little significance." *Id.* at 284.

---

[9] Although appellant and the State do not squarely address the issue, appellant was charged under the law of parties, so the jury could have convicted him if he was criminally responsible for Floyd's possession of the cocaine with intent to deliver. Just as the text message supported the State's theory that appellant had an intent to deliver cocaine, it would have supported the State's theory that appellant had the intent to promote or assist Floyd's commission of the crime and, at a minimum, was attempting to aid Floyd's commission of the crime.

Unlike in *Neal*, however, here the text message was an item of evidence, among others, that the jury might well have considered in reaching the conclusion that appellant possessed the cocaine with the intent to deliver it or intended to promote or assist Floyd's possession with intent to deliver.[10]  Appellant cites this court's prior decision in *Johnson v. State*, which is somewhat more analogous.  *See* 899 S.W.2d 250 (Tex. App.—Houston [14th Dist.] 1995, no writ).  In *Johnson*, an officer photocopied a $10 bill.  *Id.* at 252.  When the officer knocked on the door to a residence to make an undercover drug purchase, Johnson answered and asked the officer what he needed.  *Id.*  The officer said a "dime," which is street slang for one-eighth of a gram of cocaine.  *Id.*  Johnson told Harden, the State's accomplice witness, to get the officer "what he wanted."  *Id.*  Harden took a rock of cocaine from the table in the living room and gave it to the officer.  *Id.*  The officer paid Harden the $10 bill.  *Id.*  After the officer left, the police raided the apartment without a warrant.  *Id.*  When the police searched Johnson, the $10 bill was found in his pocket.  *Id.*  He was tried for the delivery of cocaine.  *Id.*  The State referenced the $10 bill during closing argument and referenced Harden's testimony that he gave the $10 to Johnson because the drugs belonged to Johnson.  *Id.*  The jury also sent notes during deliberations "requesting copies of the testimony about the seizure of the ten dollar bill from appellant."  *Id.*  at 252–53.  Despite the testimony from Harden and the undercover officer, this court reversed Johnson's conviction because the $10 bill was "essential" to corroborate their testimony and it seemed clear that the evidence of the $10 bill "prejudiced the juror's decision-making process and disrupted their orderly evaluation of the evidence."  *Id.*

---

[10] The jury charge also allowed the jury to convict appellant under the theory of the law of parties.  *See*  Tex. Penal Code Ann. § 7.02 (a)(2).

16

Although there is no jury note in this case comparable to the one in *Johnson*[11] and the text message was not necessarily "essential" to the State's case, after reviewing the entire record, we hold there is a reasonable likelihood that the error materially affected the jury's deliberations and disrupted the jury's orderly evaluation of the evidence. We cannot conclude beyond a reasonable doubt that the error in admitting evidence from the warrantless search of appellant's cell phone did not contribute to appellant's conviction.

Appellant's first issue is sustained.

## CONCLUSION

Having sustained appellant's first issue, we reverse the trial court's judgment and remand for a new trial.[12]

/s/       Sharon McCally
Justice

Panel consists of Justices McCally, Brown, and Wise.

Do Not Publish — Tex. R. App. P. 47.2(b).

---

[11] Here, the jury asked for copies of the recordings of Floyd's confession and the secretly recorded discussion between Floyd and appellant.

[12] Because we sustain appellant's first issue, we do not address appellant's second issue concerning the Confrontation Clause. *See* Tex. R. App. P. 47.1.

17