**Affirmed and Memorandum Opinion filed December 31, 2019.**



**In the**

# Fourteenth Court of Appeals

## NO. 14-16-00993-CR

**DANIEL MARK POLITTE, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 14-DCR-066326**

## MEMORANDUM OPINION

A jury found appellant Daniel Mark Politte guilty of the murder of his wife, Stephanie Politte, who was found in the couple's home with a gunshot wound to the back of her head. *See* Tex. Penal Code Ann. § 19.02. The jury assessed punishment at imprisonment for a term of 85 years, without a fine. *See id.* § 12.32. Appellant argues that the trial court erred in excluding his forensic expert, admitting certain statements he made to the police, refusing to give a jury instruction as to the right to counsel, and, at the punishment stage, refusing to give a sudden-passion instruction.

We affirm.

## I.  BACKGROUND

At 11:26 p.m. on March 11, 2014, appellant called 9-1-1 and reported that his wife, Stephanie, was vomiting and choking on blood at their home in Missouri City, Texas. The dispatcher instructed appellant to move Stephanie from her location on the couple's bed to the floor to begin CPR.

Missouri City Police Department Officer Sonnier was dispatched to the scene along with emergency medical technicians and the fire department. When appellant met Sonnier at the door, appellant was covered in blood. Appellant motioned to the bedroom, where Stephanie lay on the floor, also covered in blood. Under the impression this was a medical call, Sonnier directed the emergency medical technicians, who had arrived at approximately the same time he had, to the bedroom. Upon reaching the bedroom, the medical technicians informed Sonnier that Stephanie was deceased, and that there was a firearm in the bedroom. Sonnier overheard one of the technicians say that Stephanie had a "GSW" (gunshot wound) to the back of her head.

According to Sonnier, he instructed appellant to go to the living room and sit down, but appellant was noncompliant to the point where Sonnier threatened him with his taser. Sonnier then placed appellant in handcuffs and took him to his police car, where he removed the handcuffs.

The police car was equipped with a dashcam and internal microphone that recorded conversations between appellant and the officers at the scene while appellant was sitting in the car. During a conversation beginning at 12:25 a.m. on March 12, Missouri City Police Department Detective Joseph asked appellant if he would consent to an interview at the police station. After initially agreeing, appellant

eventually responded, "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody." During another conversation beginning at 12:49 a.m., at which time appellant had again been handcuffed, Joseph asked appellant for consent to search the house. Appellant declined and, after the conversation ended and the car door had closed, appellant exclaimed, "I'm fucked!" Appellant requested that the dashcam recordings containing these statements be suppressed, a request the trial court denied following a suppression hearing.[1]

The State charged appellant with murder. *See* Tex. Penal Code Ann. § 19.02. At trial, the State argued that appellant intentionally shot and killed Stephanie while she was sleeping. The State's evidence included a picture of a sleeping Stephanie taken approximately 20 minutes before the shooting. The State's witnesses included experts Dr. Mambo, the medical examiner on the case, and crime-scene investigator Rossi. During his testimony, Mambo opined that, because there was no stippling around the entry wound on the back of Stephanie's head, the shot that killed her must have been fired from at least "12 to 15 inches" away from her head.[2] Mambo also opined that bruising on Stephanie's cheek was caused by the bullet hitting, but not penetrating, the skin of her cheek, a circumstance caused by the cheek having been pressed up against "some object" at the time of the gunshot. Rossi opined that, at the time of the shooting, Stephanie was lying on her left side, with her left cheek supported by a pillow on the bed. After Mambo and Rossi testified, appellant attempted to contest their testimony by offering testimony from a previously

---

[1] The request was originally couched as motion in limine, which the trial court, with the agreement of the State, construed and treated as a motion to suppress.

[2] According to Mambo, "stippling" means small pock marks caused by unburned gunpowder particles hitting the skin following a gunshot.

3

undisclosed expert, Dr. Sperry.[3] The trial court excluded the testimony of Sperry.

The defense argued that the shooting had been an accident—that appellant had seen an awake Stephanie with a gun in her hand and, concerned that she might hurt herself, struggled with her to retrieve the weapon, during which struggle the gun accidentally went off. The jury heard evidence consistent with this theory, including: a recording of a conversation between appellant and his parents, during which appellant said that he had tried to take the gun away from Stephanie, but the gun had gone off during the struggle, though he did not know when the gun had gone off because he did not hear the gunshot; testimony of appellant's sister Marie Connor and Stephanie's friend Frances Sharp, each of whom testified that appellant had told her that he and Stephanie had struggled for the gun; and a recording of a conversation between appellant and Neil Kirkpatrick, Stephanie's father, during which appellant said that he had gotten the gun away from Stephanie after a struggle, that he did not hear the gun go off, and that the gun may have gone off after appellant got off the bed and tripped near some shoes by the doorway to the bedroom. The jury also heard the cross-examinations of Mambo and Rossi, during which they conceded that, from their analysis, they could not determine whether the shooting had been intentional or accidental.

The jury found appellant guilty of murder. At the punishment phase of the trial, appellant requested a sudden-passion instruction, which the trial court denied. The jury assessed punishment at imprisonment for a term of 85 years.

---

[3] On the State's motion, the trial court had ordered that all defense experts be disclosed prior to trial. Sperry was not included on the defense's expert list. Mambo and Rossi had been disclosed by the State before trial.

4

## II.  ANALYSIS

### A.  Exclusion of appellant's expert

In his first issue, appellant contends that the trial court deprived him of his constitutional rights to due process and a fair trial by excluding Sperry, appellant's expert on forensic pathology. *See* U.S. Const. amends. VI, XIV. Appellant sought to introduce Sperry to counter certain testimony by the State's experts Mambo and Rossi. Specifically, Sperry would have testified that Mambo erred in concluding that, because there was no stippling around the entry wound on the back of Stephanie's head, the shot that killed her must have been fired from at least "12 to 15 inches" away from her head. Sperry would have testified that any stippling could have been blocked by Stephanie's hair, and accordingly the gun could have been closer to her head when it was fired. Sperry also would have contested the testimony of Mambo and Rossi that Stephanie's head was supported by a pillow or some other object at the time she was shot. Appellant contends that Sperry's testimony was necessary to present his defense that the shooting had been an accident following a struggle for the weapon, as the testimony would challenge the State's theory that Stephanie was sleeping with her head on the pillow at the time she was shot.

Exclusion of a defendant's evidence rises to the level of constitutional error "only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense."[4] *Potier v. State*, 68 S.W.3d 657,

---

[4] Appellant suggests that the applicable standard for reviewing this issue is "whether one juror hearing this evidence would have been swayed," citing *Buck v. Davis*, 137 S. Ct. 759 (2017). This refers to the standard for evaluating constitutional harm the U.S. Supreme Court articulated in the ineffective-assistance-of-counsel context. *See id.* at 765 (evaluating whether it was "reasonably probable" that "at least one juror would have harbored a reasonable doubt" but for counsel's deficient performance). We do not reach the issue of constitutional harm, however, because we disagree that the trial court committed constitutional error in excluding Sperry. *See* Tex. R. App. P. 44.2(a).

665 (Tex. Crim. App. 2002).[5] Appellant's defense in this case was that the shot that killed Stephanie was fired by accident during, or shortly after, his struggle with Stephanie for the gun, as he did not remember the gun going off and did not intend to kill Stephanie. The jury heard the following evidence, among other things, in support of appellant's defensive theory:

- Appellant's phone call to his parents from jail, in which he stated that Stephanie "was trying to hurt herself and I, I, I grabbed the gun away, and then it—I don't know—I never even heard a gunshot or anything. All of a sudden, she was bleeding, and I thought it was 'cause—I thought it was 'cause maybe I was too rough or something." He further stated that he and Stephanie were "on the bed"—"I was on top of her, I was trying to wrestle it [the gun] away. And I had gotten it, but she—I think she might have had it half cocked or something."

- The testimony of Marie Connor (appellant's sister), who testified that appellant told her that "he was in the kitchen making her [Stephanie] dinner, heard her banging around in the bedroom, went in to check on her and noticed she had a gun. And then there was a struggle trying to get it from her, and that's all he could remember."

- The testimony of Frances Sharp, a friend of Stephanie's, who testified that appellant told her that Stephanie "got a gun, and that they wrestled for it, and then the gun went off."

- Appellant's telephone conversation with Neil Kirkpatrick (Stephanie's father), during which appellant stated, "I'm telling you I got it [the gun] away from her. I fucked up. I fell over by the fucking—shoes by the door, or she kicked me or something, and I was I think I was trying—I don't even know what the fuck

---

[5] *Potier* collected and discussed U.S. Supreme Court cases concerning "vital" evidence warranting a new trial, including: *Ferguson v. Georgia*, 365 U.S. 570 (1961) (denial of defendant's right to testify under oath and with the assistance of counsel); *Washington v. Texas*, 388 U.S. 14 (1967) (denial of right to present vital evidence of co-defendant); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (denial of right to present vital, reliable hearsay evidence, combined with denial of right to cross-examine); and *Rock v. Arkansas*, 483 U.S. 44 (1987) (denial of defendant's right to testify to vital evidence about offense).

happened, it went off. I don't even remember hearing it."

These excerpts demonstrate that, even without the testimony of Sperry, appellant was able to present his defense of accident to the jury. The testimony of Mambo and Rossi, moreover, does not bar appellant's defensive theory. Mambo agreed that it was "possible" that the gunshot could have resulted from a struggle:

> Q. [Defense counsel] It would be unusual, to say the least, if somebody held a gun at this angle and shot themselves, right?
>
> A. [Mambo] That's correct.
>
> Q. Okay. Now, if they had a gun in their hand, and they were struggling with someone else over that gun, could their hand have been pushed back to that angle while they still had the gun in the hand and possibly shot them?
>
> A. It's possible.

Rossi likewise admitted during her testimony that it was possible, based on the physical evidence at the scene, that the shooting could have occurred either as the result of a struggle, or from across the room, consistent with two of the accounts appellant gave of the incident:

> Q. [Defense counsel] Jury, use your imagination. If I'm on top of her [Stephanie], I could be grabbing the gun, trying to jerk it out of her hand, and get the gun up at an angle like I'm demonstrating to the jury. Whether you agree it's exactly right or not, I could get it up here, right? If I'm on top of her, if I swing this leg over, I've got her up here, approximately same angle, right?
>
> A. [Rossi] I would say that's approximately the same angle.
>
> Q. Okay. And if I'm—there was some conversation in one of the tapes where he says, "I was on top of her, I think I got the gun from her." . . . "I think I got the gun from her, and I think I was getting off, and I stumbled – I may have fallen." Remember that in the tape?
>
> A. Yes.
>
> Q. So, if I've got the gun, and I'm trying to—I got it away from her, she's turned away, because she knows I've got the gun in my hand now,

and I stumble on something, the gun could go off while I've got it right here in my hands, right?

A. It could, yes, sir.

Q. Okay. And that matches your scenario that the shot came from the left side of the bed, from this side—if I'm facing the bed, this is the left side of the bed?

A. Yes, sir.

Q. And your scenario in your report is that the shot—you believe the shot came from the this side of the bed, while he was standing near the nightstand?

A. Yes, sir. Yes, sir.

. . . .

Q. And let's say that Mr. Politte's on the right side of the bed, still on the bed, maybe on his knees. He's gotten the gun away from her, and he's coming back away from her, and again, in an effort to de-cock the gun, he could shoot her at approximately the same angle?

A. That is not the same angle, sir.

Q. Okay. I can manipulate her head to get it basically in the—I know you're not going to like the cheek thing, but approximately the same angle where the bullet goes down right here, hits her in the same place it hit Ms. Politte, goes through her head and lodges behind her cheek, near her cheek.

A. Correct, and you still have to be 12 inches.

Q. Okay. I'll back up a little. Twelve inches.

A. Okay.

Q. Could happen that way?

A. Sure.

Finally, both Mambo and Rossi admitted that they could not determine from the evidence they examined whether the death was intentional or accidental—a fact that the defense highlighted in closing in support of the theory that the shooting had been an accident.

The record reflects that appellant was able to present the substance of his defense of accident to the jury, and accordingly was not deprived of his constitutional rights to due process and a fair trial. *Potier*, 68 S.W.3d at 666 ("'That [the defendant] was unable to . . . present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury.'") (quoting *United States v. Willie,* 941 F.2d 1384, 1398–99 (10th Cir. 1991)); *Tillman v. State*, 376 S.W.3d 188, 198 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (concluding exclusion of expert "was not of constitutional dimension" when "the excluded testimony would have furthered appellant's defensive theory only incrementally" in light of other evidence in record and defense argument at closing). Appellant's first issue is overruled.[6]

## B. Appellant's recorded statements

In his second and third issues, appellant challenges the trial court's admission of statements in recordings from the police car dashcam. Appellant argues that, because the trial court failed to suppress the dashcam recordings, "the jury heard [appellant] make both a request for counsel and an easily misinterpreted statement, one that could be taken as an admission of guilt." The two statements— a statement to Joseph that "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody," and a later exclamation, "I'm fucked!"—and appellant's various arguments about them are addressed in turn below.

---

[6] Appellant notes that, "under long established rules here in Texas, rebuttal witnesses do not have to be noticed, at least if one is the State," citing *Marx v. State*, 953 S.W.2d 321 (Tex. App.—Austin 1997), *aff'd*, 987 S.W.2d 577 (Tex. Crim. App. 1999), and *DePena v. State*, 148 S.W.3d 461 (Tex. App.—Corpus Christi 2004, no pet.). Appellant, however, asserts only a constitutional issue, and in his reply explicitly disclaims any nonconstitutional grounds for challenging the trial court's ruling excluding Sperry. Accordingly, we need not address whether the trial court's evidentiary ruling was either erroneous or harmful under Texas Rule of Appellate Procedure 44.2(b). *Clark v. State*, 305 S.W.3d 351, 360 n.4 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 365 S.W.3d 333 (Tex. Crim. App. 2012).

### 1. Appellant's reference to counsel

Approximately an hour after the shooting, and after Sonnier placed appellant in handcuffs and escorted him to the police car before removing the handcuffs, appellant (identified as "Defendant" in the transcript below) had the following exchange with Joseph while seated in the police car, as transcribed in the trial court's findings of fact:[7]

> JOSEPH: Hey Daniel how are you?
>
> DEFENDANT: You're not gonna hurt me are you?
>
> JOSEPH: No I'm not gonna hurt you, nobody is going to hurt you. I'm Detective Joseph, how are you doing?
>
> DEFENDANT: I've, I've been a lot better[.]
>
> JOSEPH: Ok—would you like to come down to the station and talk to me and tell me what happened?
>
> DEFENDANT: No, I, I, I would like to use the restroom and then . . . yes[.]
>
> JOSEPH: And then you would talk to me? Ok.
>
> DEFENDANT: Yes.
>
> JOSEPH: That's fine.
>
> DEFENDANT: Is that ok?
>
> JOSEPH: Yea, that's fine[.]
>
> DEFENDANT: Where is my wife?
>
> JOSEPH: Where's what?
>
> DEFENDANT: Where is my wife?
>
> JOSEPH: I have not gone in the house, why don't we wait until we get to the station to talk about it?
>
> DEFENDANT: I really don't want to wait to talk about that but . . .
>
> OTHER OFFICER: Stay in the car[.]

---

[7] The transcripts included in the trial court's findings of fact were provided by the State, and appellant does not challenge their accuracy.

DEFENDANT: I don't want . . . I haven't done anything wrong[.]

JOSEPH: Just stay in the car though, Daniel, stay in the car[.]

DEFENDANT: I'm not going anywhere[.]

JOSEPH: Ok, just stay in the car for us[.]

DEFENDANT: I would like to use the restroom[.]

JOSEPH: Ok, we'll bring you to the station then[.]

**DEFENDANT: And well, that's fine, but like if, if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody[.]**

JOSEPH: Ok, that's up to you[.]

(Emphasis added.)

Appellant argues that his statement, "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody," should have been suppressed because it was the product of a custodial interrogation, and appellant had not been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), or Code of Criminal Procedure article 38.22.[8]

Under *Miranda*, the State may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. at 444. Likewise, article 38.22 provides that "[n]o oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless," among other things, "prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." Tex. Code

---

[8] Aside from this statement, the trial court suppressed other statements concerning the right to counsel by appellant or others in the dashcam recordings.

Crim. Proc. Ann. art. 38.22, § 3(a).

Determining whether a custodial interrogation occurred involves examining both whether the accused was "in custody" and whether he was "interrogated." *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a); *Little v. State*, 853 S.W.2d 179, 183 (Tex. App.—Corpus Christi 1993, no writ) ("For *Miranda* safeguards to attach, two threshold issues must be met: 1) the suspect must have been 'in custody,' and 2) the police must have 'interrogated' the suspect.").

We begin with the question of custody. A person is considered "in custody" if a reasonable person in the same circumstances would have perceived his physical freedom to be restricted "to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. Cal.*, 511 U.S. 318, 322 (1994)). "The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Id.* at 255 (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)). The court of criminal appeals has established four general situations which may constitute custody: (1) if the suspect is physically deprived of his freedom in any significant way; (2) if a law-enforcement officer tells the suspect not to leave; (3) if a law-enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; or (4) if there is probable cause to arrest the suspect, and the law-enforcement officer does not tell the suspect he is free to leave. *Gardner v. State,* 306 S.W.3d 274, 294 (Tex. Crim. App. 2009).

The trial court found that, at the time appellant made his statement about "a lawyer," he was not in custody. We disagree. Appellant had this conversation with Joseph less than an hour after having been removed from his home in handcuffs and placed in the police car, all while covered in his wife's blood. While the handcuffs

12

had been removed by the time Joseph commenced this dialogue with appellant, during the conversation appellant was told several times to stay in the police car, and was not allowed to leave even to go to the bathroom. Looking to the relevant factors, we conclude that appellant was deprived of his freedom in a significant way and told not to leave, and that a reasonable person would have concluded from these circumstances that his freedom of movement had been significantly restricted. *See id.* In other words, appellant was in custody.

We must determine, then, whether appellant made his statement in response to interrogation. Not all police questioning can be classified as "interrogation." Questioning normally attendant to arrest and custody is not interrogation. *R.I. v. Innis*, 446 U.S. 291, 300–02 (1980); *McCambridge v. State*, 712 S.W.2d 499, 505 (Tex. Crim. App. 1986). Likewise, police requests that suspects perform sobriety tests and questions concerning a suspect's understanding of his rights do not constitute "interrogation." *Jones v. State,* 795 S.W.2d 171, 176 (Tex. Crim. App. 1990). Questioning that does not constitute "interrogation" falls outside of the safeguards of *Miranda* and article 38.22. *Innis*, 446 U.S. at 300; Tex. Code Crim. Proc. Ann. art. 38.22, § 5 ("Nothing in this article precludes the admission . . . of a statement that does not stem from custodial interrogation . . . .").

We hold that appellant's statement concerning a lawyer was not the product of "interrogation." In the discussion between appellant and Joseph leading up to the statement, Joseph asks non-substantive questions about whether and where an interview may be held, and does not ask appellant any questions about the facts of the case. Indeed, Joseph later clarified to appellant, "I can't go on talking to you unless you want to talk to me, and if you do, we gotta go to the station and do it. I'm not gonna try to interview you here on the street." Under the circumstances, the questions asked by Joseph do not qualify as "interrogation" for purposes of *Miranda*

13

or article 38.22. *See Innis*, 446 U.S. at 300–02; *McCambridge*, 712 S.W.2d at 505; *see also Lam v. State*, 25 S.W.3d 233, 239–40 (Tex. App.—San Antonio 2000, no pet.) (holding that questioning was not "interrogation" when officer "attempted to stop the conversation, and in doing so, he recommended that they return to the police station where [defendant] could make a statement with the appropriate safeguards"). Accordingly, the trial court did not err in declining to suppress appellant's statement, "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody," on the grounds that it was the product of custodial interrogation.

Appellant also argues that this statement was erroneously admitted as an unambiguous assertion of his right to counsel. An invocation of the right to counsel is not admissible at trial. *Hardie v. State*, 807 S.W.2d 319, 321–22 (Tex. Crim. App. 1991). Not every reference to a lawyer, however, constitutes an invocation of the right to counsel. "An invocation must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995). Statements that an accused does not wish to speak to the police before consulting an attorney are more properly characterized as referencing the accused's desire to remain silent rather than his right to counsel. *See State v. Lee*, 15 S.W.3d 921, 923–24 (Tex. Crim. App. 2000), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).

Here, in response to Joseph's assertion that appellant would be brought to the police station—which was consistent with appellant's earlier agreement to an interview at the station—appellant responded "that's fine" before adding "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody." This conditional statement is best construed as an expression of appellant's desire to remain silent or to speak to an attorney in the event of a future

14

interview at the police station, not as an immediate request for counsel. Under these circumstances, appellant's statement was not a clear and unambiguous invocation of his right to counsel and was not improperly admitted as such. *See id.*

We overrule appellant's challenges to the trial court's admission of appellant's statement, "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody."

### 2. Appellant's exclamation in police car

Approximately 20 minutes after appellant's statement concerning counsel discussed above, appellant, while still in the police car, had another discussion with Joseph, who asked appellant to give consent for the police to search his house. Appellant declined, saying it was "nothing personal," leading to the following exchange:

> JOSEPH: Alright, that's fine; I'm not taking it personal.
> DEFENDANT: No, you shouldn't. I mean you guys . . .
> JOSEPH: Ok, I'll talk to you in a little bit.
> DEFENDANT: Sir, sir you've been nothing but professional, thank you[.]
> (Door closes)
> DEFENDANT: Fucking . . . I'm fucked!

Appellant argues that his exclamation "I'm fucked!" should have been suppressed because it was the product of custodial interrogation and was made after he asserted his right to counsel.[9] The trial court found that appellant was in custody at the time he made this statement. As above, however, the statement was not made

---

[9] After the initial reference to a lawyer discussed above, appellant made additional references to counsel that were not played for the jury before making his exclamation in the police car. We need not reach the issue of whether these additional references to counsel constituted invocation of the right to counsel for the reasons stated herein.

pursuant to any interrogation. On the dashcam recording, several seconds elapse between the door closing and appellant's spontaneous statement. The statement is not made in response to any question or statement at all, and thereby could not have stemmed from interrogation. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 5 ("Nothing in this article precludes the admission . . . of a statement that does not stem from custodial interrogation . . . ."). Accordingly, the trial court did not err in declining to suppress the statement, either on the grounds that it was the product of a custodial interrogation, or that it was given after appellant asserted his right to counsel. *See id.*; *Davis v. State*, 516 S.W.2d 157, 159–62 (Tex. Crim. App. 1974) (holding that spontaneous statement that defendant had stolen a car was admissible when "[t]here was no interrogation"); *Little*, 853 S.W.2d at 183–84 (holding that motorist's spontaneously volunteered statement that he had consumed five beers, made before he was advised of his *Miranda* rights, was not product of "custodial interrogation" and did not have to be suppressed); *see also Me. v. Moulton*, 474 U.S. 159, 176 (1985) ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.").

We overrule Appellant's second and third issues.

## C. Jury instruction concerning right to counsel

In his fourth issue, appellant argues that the trial court erred in denying him a jury instruction stating that his invocation of his right to counsel should not be held against him.[10] Appellant argues that, because the trial court erroneously admitted

---

[10] The requested instruction reads: "In a criminal case, the law permits a [D]efendant to invoke his right to counsel, and that you should not hold that as a circumstance against the Defendant, and, therefore, you will not consider the fact that the Defendant invoked his right to counsel, if he did, as a circumstance against him, and you will not, in your retirement to consider your verdict, allude to, comment on or in any manner refer to the fact that the Defendant invoked

16

appellant's statement, "if you're insinuating some wrong doing I would really like to have a lawyer before I talk to anybody," appellant was consequently entitled to an instruction curing this error. As discussed above, the trial court found, and we agree, that appellant's statement did not constitute an invocation of the right to counsel, and accordingly the trial court did not err in admitting the statement on that basis. Consequently, no curative instruction was required, and we overrule appellant's fourth issue.

## D. Jury instruction on sudden passion

In his fifth issue, appellant argues that the trial court erred in denying him a sudden-passion instruction in the jury charge. "At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code Ann. § 19.02(d). Sudden passion is "passion directly caused by and arising out of provocation by the individual killed" which "arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

The defendant has the burden of production and persuasion with respect to the issue of sudden passion. *Wooten v. State,* 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). To justify a jury instruction on the issue during the punishment phase, the record must at least minimally support an inference: (1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) that his sudden passion was in fact induced by some provocation by

his right to counsel."

17

the deceased or another acting with her; (3) that he committed the murder before regaining his capacity for cool reflection; and (4) that a causal connection existed between the provocation, passion, and homicide. *Id.*

Appellant argues that references in the record to Stephanie's "emotional disorders" prior to the shooting, and to appellant's "dissociative disorder" and "distraught appearance and manner" after the shooting, satisfy the requirements of the sudden-passion defense. None of this evidence, however, indicates that appellant acted "under the ***immediate*** influence" of sudden passion at the time of the shooting. *See* Tex. Penal Code Ann. § 19.02(d) (emphasis added). Even if the evidence that appellant struggled to get the gun from Stephanie were credited, thereby creating what the defense terms "an emotionally charged situation" at the time of the shooting, there is no causal connection between trying to retrieve the gun from Stephanie and then intentionally shooting her. *See Wooten*, 400 S.W.3d at 605 (requiring that causal connection exist between the provocation, passion, and homicide). We overrule appellant's fifth issue.

### III.   CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.

/s/      Charles A. Spain
         Justice

Panel consists of Justices Wise, Zimmerer, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).

18