

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00130-CR

———————————————

CHRISTOPHER LYNN PETTY, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 57,642-C

---

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Christopher Lynn Petty appeals his conviction of aggravated sexual assault of a child, Lisa.[1]  *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii), (a)(2)(B). In three issues, Petty complains that the trial court abused its discretion by designating a certain outcry witness, that the trial court abused its discretion by refusing to admit certain evidence of Lisa's prior sexual conduct, and that the evidence is insufficient to support his conviction.  We will affirm.

## II. BACKGROUND

### A. Petty's Relationship with Lisa's Mother

Sometime around the end of 2014 and the beginning of 2015, Petty was in a relationship with Lisa's mother, Jade.[2]  While Petty was in a relationship with Jade, he spent most nights at Jade's house.  Jade moved while dating Petty, living in a house "off of Kemp" and a house on "Avenue G."[3]  Petty followed Jade during the move,

---

[1]To protect the anonymity of the victim in this case, we will use aliases to refer to her and others connected with the case.  *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]Petty was forty-three years old at the time.

[3]For ease of reference, we will refer to these two locations as the "Kemp house" and the "Avenue G house."  There is conflicting evidence in the record as to whether Jade lived first at the Kemp house or first at the Avenue G house.

spending most nights with her at each location. During this time period, Jade also lived with her children, including Lisa, who was twelve years old at the time.[4]

## B. Lisa Becomes Pregnant

In 2015, Lisa noticed that she had missed her period, with her last period occurring in December 2014. Lisa told Jade about her missed period, but, according to Lisa, Jade "didn't do nothing."[5] After about six months, and with her stomach increasingly growing, Lisa figured out on her own that she was pregnant.

In September 2015, Camille Schmader, an investigator with Child Protective Services (CPS), received a referral relating to Lisa's pregnancy. Schmader went to Lisa's elementary school to meet with Lisa and observed that Lisa was about eight months pregnant.[6] Schmader then notified law enforcement about Lisa's pregnancy, contacting Walter Vermillion, a Wichita Falls police officer who was assigned to the Crimes Against Children unit.[7]

---

[4]At trial, Jade testified that while the family was living at the Kemp house, she was also living with her mother and her mother's boyfriend. It is unclear from the record whether Jade's mother and Jade's mother's boyfriend also lived in the Avenue G house.

[5]At trial, Jade testified that when Lisa told her about Lisa's missed period, she told Lisa that it might just be an irregular period, mentioning to Lisa that her own periods came irregularly.

[6]Lisa was in the sixth grade at the time.

[7]Jade testified at trial that she did not know that Lisa was pregnant until Lisa's school became "concerned about her stomach" and CPS got involved.

## C. The First Forensic Interview

On September 9, 2015, Schmader took Lisa to Patsy's House[8] for a forensic interview. Shannon Althouse,[9] a forensic interviewer for Patsy's House, conducted the interview. During that interview, Lisa indicated that T.J., a boy who was nine years old and in the third grade at the time, was the father of her unborn child. Lisa told Althouse that T.J. had "put his stuff in her wrong part" while in the "kids' room" at the Kemp house. Lisa recounted that T.J. "came into the room and had sex, and then that he asked her if she wanted some sex" and that "she told him no, that she was trying to sleep."[10] Lisa told Althouse that the incident with T.J. had occurred two or three months prior to that forensic interview, although Althouse noted that Lisa appeared to be more than two to three months pregnant at the time of that interview.[11] Lisa did not mention Petty during that interview. Lisa did, however,

---

[8]The record reflects that Patsy's House is a local child advocacy center that provides a neutral environment for child abuse victims to discuss what has happened to them.

[9]During part of this case, Althouse's last name was May. For consistency, we will refer to her as "Althouse."

[10]Althouse testified that Lisa did not give any more details about the alleged incident with T.J. and that she found it difficult to understand what Lisa meant by her description of the incident.

[11]At trial, Lisa stated that she had lied during the first forensic interview when she said that T.J. had impregnated her. Lisa indicated that nothing sexual had ever happened between her and T.J., stating that she had lied during the interview because she was scared.

indicate to Althouse that she had not told Althouse everything about what had occurred, mentioning that "she wasn't ready to tell everything."

## D. The Second Forensic Interview

On September 11, 2015—two days after the first forensic interview—Lisa went back to Patsy's House for a second forensic interview.[12] During that interview, Lisa indicated that she had been sexually abused by Petty on one occasion. Lisa told Althouse that the incident had occurred at night in the "kids' room" in the Avenue G house, while other children were in the room asleep. Lisa was hesitant to talk to Althouse during the interview, so Althouse had Lisa write down what had happened to her. While Lisa was writing, she asked Althouse how to spell the word "rape." During the interview, Lisa indicated that Petty had put his "private part that goes pee" in her "private part . . . that goes pee." Lisa also indicated that she had tried to stop the abuse by asking Petty to get off her and by trying to move her body away from him but that she was unable to stop the assault. She described to Althouse that her private parts were wet after the incident and that it had hurt. Lisa also indicated that she thought that Petty had raped her as punishment for not doing her chores

---

[12]Althouse testified that she believed that a second forensic interview was conducted because Lisa had made some additional outcry to Jade after the first forensic interview. As will be discussed in more detail below, the trial court later conducted a hearing to determine whether Althouse or Jade was the proper outcry witness pursuant to Article 38.072 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.072. The trial court ultimately determined that Althouse was the proper outcry witness.

correctly. Lisa told Althouse that she had not mentioned Petty during the first forensic interview because "she wasn't ready."

## E. The DNA Tests

In October 2015, one month after turning thirteen, Lisa gave birth to Lyle. That same month, DNA samples were collected from Lisa and Lyle via buccal swabs. Vermillion testified that he personally collected Lisa's DNA sample. As to Lyle's DNA sample, Vermillion testified that he requested that Katie Harrill,[13] a nurse at the hospital where Lyle was born, administer the buccal swabs as Vermillion thought that she would be better at handling a newborn. Vermillion instructed Harrill how to obtain Lyle's DNA, and Vermillion observed that Harrill took the swab correctly. Harrill testified at trial that Vermillion had taken the swab out of its packaging and handed it to her, and that after taking the swab, she handed it back to Vermillion. Harrill testified that she wore gloves while obtaining Lyle's DNA, although she did not wear a mask.

In March 2016, Vermillion obtained a DNA sample from Petty via buccal swabs while Petty was in one of the interview rooms of the Wichita Falls Police Department. At trial, Vermillion testified that he wore gloves when obtaining Petty's DNA, although he did not wear a mask. He also testified that he would not call the interview room a sterile environment.

---

[13]By the time of trial, Harrill's last name had changed to Case. For consistency, we will refer to her as "Harrill."

Vermillion testified that after the respective swabs were collected and sealed, they were placed into different paper bags and sealed with evidence tape, and then they were turned over to the property room for storage. In March 2016, Brad Love, a detective with the Wichita Falls Police Department, gathered the respective samples and took them to the Southwestern Institute of Forensic Sciences in Dallas (SWIFS).[14]

At trial, Amanda Webb, a forensic biologist at SWIFS, testified regarding the respective DNA samples. She stated that SWIFS received the samples from the Wichita Falls Police Department in March 2016, that she was able to extract DNA from each of the buccal swabs, that she performed DNA testing on the samples, and that she made a report of her findings. Webb testified that she performed the testing while wearing gloves and a lab coat, although she did not wear a mask. While Webb acknowledged that it was possible for a DNA sample to be contaminated if someone breathed on it, she also stated that she could tell if a DNA sample came from a single individual or multiple contributors. Webb testified that "for each buccal swab standard [in this case, she] obtained a DNA profile from a single person."

As to the results of her DNA testing, Webb stated that the probability that a randomly selected man would be excluded as being Lyle's biological father was greater than 99.99 percent and that Petty could not be excluded as being Lyle's biological father. She further testified that it was 144,000 times more likely that Petty is Lyle's

---

[14]Love testified that he drove the respective samples straight to SWIFS without making any stops.

biological father than a randomly selected, unrelated male. She also stated that "based upon the most conservative probability of paternity statistics, and ignoring all non-genetic information, the probability that [Petty] is the biological father of [Lyle] is greater than 99.99 percent."[15]

## F. Lisa's Testimony at Trial

Lisa was eighteen years old at trial. She testified that Petty was dating Jade in 2014 and 2015 and that during that timeframe he would spend "[m]ultiple nights in a row" at Jade's house. Lisa testified that Petty had raped her. She testified that the assault occurred one night in the "kids' room" when she was living at the Kemp house. She recounted that just before the assault occurred, she had been sleeping with her sister on one twin bed in the room, while two of her brothers were sleeping on another twin bed in the room, and while her oldest brother, Scott, was also sleeping in the room.[16] Lisa described Petty coming into the room while she was sleeping, pulling down his pants and getting on top of her, and putting his penis in her vagina. She stated that she tried to push Petty off her, but that it did not work. She also stated that none of her siblings in the room woke up during the assault and that

[15]At trial, Vermillion testified that he had also obtained a DNA sample from Scott, Lisa's older brother. Vermillion indicated that he obtained Scott's DNA sample before Lisa named Petty as her abuser. Vermillion stated that Scott's DNA sample was never tested because after obtaining the results indicating that Petty was Lyle's father, Vermillion did not think it was necessary to also test Scott's DNA sample.

[16]It is unclear from Lisa's testimony what Scott was sleeping upon, although Lisa mentioned that a couch was located in the "kids' room."

she did not try to wake anyone up because she was scared. Lisa stated that Petty stopped raping her "[w]henever he nutted" and that she went into the bathroom and cried. Lisa indicated that she did not wake up Jade because she was scared that CPS would take her siblings away if she reported the assault.

## G. Petty is Convicted and Now Appeals

A jury found Petty guilty of aggravated sexual assault of a child. The jury found two enhancement paragraphs to be true and assessed his punishment at confinement for life. The trial court sentenced him accordingly, and this appeal followed.

## III. DISCUSSION

## A. Petty's Complaint Regarding the Trial Court's Outcry Witness Designation

In his first issue, Petty complains that the trial court abused its discretion by designating Althouse as the outcry witness and by relying on allegedly inadmissible testimony regarding what Lisa told Jade. In response, the State argues, among other things, that Petty has not challenged all independent grounds for the trial court's designation; that Petty has waived his complaint; and that even if the trial court erred by designating Althouse as the outcry witness, any error made by the trial court was harmless.

### 1. Background to Petty's Complaint

Prior to trial, the State gave notice of its intent to offer hearsay statements pursuant to Article 38.072 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.072. In its notice, the State indicated that it believed that

9

Althouse was the first person at least eighteen years of age or older that Lisa made a statement to concerning the alleged abuse, and the State indicated that it intended to offer the outcry statements made by Lisa to Althouse regarding the abuse. The State's notice also indicated that it believed that Jade was the first person at least eighteen years of age or older that Lisa made a statement to concerning the alleged abuse, and the State indicated that it intended to offer the outcry statements made by Lisa to Jade regarding the abuse.[17]

The trial court held a pretrial hearing regarding the proper designation of outcry witness. At the hearing, Matthew Ohm, an investigator with the Wichita County District Attorney's Office, testified that he had contacted Jade about the case and that she was uncooperative. Ohm also testified that he had served Jade with a subpoena for the outcry hearing but that Jade did not show up at the hearing. Vermillion testified at the outcry hearing that he had become aware that Jade and Althouse were potential outcry witnesses. Over hearsay and Confrontation Clause objections, Vermillion testified that on September 10, 2015, Lisa had told Jade that Lisa was "messing around" with Petty. Later at the hearing, without any objection, Althouse testified that Lisa had told Jade that Lisa and Petty "had messed around."

_____

[17]In an exhibit attached to the notice, the State indicated that on September 10, 2015, Lisa had told Jade that Petty was "messing around" with Lisa. The State further indicated that on September 11, 2015, Lisa had told Althouse that Petty had put his penis in Lisa's vagina in the winter of 2014 while everyone was asleep in the kids' room of the Avenue G house.

10

Althouse further testified that on September 11, 2015—during the second forensic interview—Lisa had given a detailed account to her of the assault.

After testimony was given, the State argued that Althouse was the proper outcry witness, contending that (1) Jade was uncooperative and was unavailable to serve as an outcry witness, and (2) Althouse was the first adult to whom Lisa had made specific statements regarding the assault. In a written order, the trial court found that Althouse was the proper outcry witness under Article 38.072. The trial court found that Jade "is not available as a witness,"[18] and that in any event, the statement made by Lisa to Jade "was a general statement lacking the specificity to qualify as an outcry statement." In a motion to reconsider this ruling, Petty conceded that Jade was an unavailable witness, noting that "[t]here was clear evidence that [Jade] refused to testify about the subject matter despite a court order to do so."[19]

## 2. Applicable Law and the Standard of Review

Hearsay is generally inadmissible. Tex. R. Evid. 802. But Article 38.072 establishes an exception to the hearsay rule for a statement made by a child or

---

[18]While Jade did not appear at the outcry hearing, she did appear at trial after a writ of attachment was issued compelling her attendance. At trial, Jade testified that she did not want to be there. She stated that she had declined to meet with the State to discuss the case and admitted that she had told an investigator working with the State that she did not want to be involved in the case and that since Lisa was an adult, Lisa could "deal with all of this[.]"

[19]The trial court denied Petty's motion to reconsider its order designating Althouse as the outcry witness.

11

disabled victim "to the first person, 18 years of age or older, other than the defendant, to whom the [victim] . . . made a statement about the offense." Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(3). Article 38.072 requires more than "a general allusion that something in the area of child abuse was going on." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). To be a proper outcry statement, the child's statement to the witness must describe the alleged offense, or an element of the offense, in some discernible manner. *See id.* As a general rule, in order to describe the alleged offense in a discernible manner, the statement must contain the "how," "when," or "where" the offense allegedly transpired. *Garcia v. State*, No. 02-17-00081-CR, 2018 WL 1095692, at *1 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication). An outcry witness is event-specific rather than person-specific. *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). Thus, a trial court may admit hearsay testimony from more than one outcry witness under Article 38.072 only if the witnesses testify about different events; for any one event, there may be only one "first person . . . to whom the [victim] . . . made a statement about the offense[.]" Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(3); *see Lopez*, 343 S.W.3d at 140.

Courts interpreting Article 38.072 have held that the "'first person' refers to the first adult who can remember and relate at trial the child's statement that in some discernible manner describes the alleged offense." *Dority v. State*, 631 S.W.3d 779, 792 (Tex. App.—Eastland 2021, no pet.); *Foreman v. State*, 995 S.W.2d 854, 859 (Tex.

12

App.—Austin 1999, pet. ref'd). Thus, when an adult does not remember the outcry or refuses to cooperate with the prosecution, the adult cannot be the outcry witness. *See, e.g.*, *Carty v. State*, 178 S.W.3d 297, 306 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (holding that victim's mother was not the proper outcry witness because she refused to cooperate with the State, was under indictment for failing to report the abuse, and refused to admit that the victim had made an outcry); *Foreman*, 995 S.W.2d at 859 (holding that victim's mother and stepfather were not proper outcry witnesses when they both testified that they had no memory of the outcry); *Anderson v. State*, 831 S.W.2d 50, 54 (Tex. App.—Fort Worth 1992, pet. ref'd) (holding that victim's mother was not the proper outcry witness because she refused to cooperate with authorities and had refused to admit that the abuse had been reported to her).

A trial court has broad discretion to determine which of several witnesses is an outcry witness to a particular event, and unless the trial court clearly abuses its discretion, we will not disturb its decision. *Starkey v. State*, No. 02-18-00192-CR, 2019 WL 3819505, at *7 (Tex. App.—Fort Worth Aug. 15, 2019, pet. ref'd) (mem. op., not designated for publication); *Chapman v. State*, 150 S.W.3d 809, 813 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

### 3. Analysis

As a preliminary matter, we will address an argument made in the State's response brief that we should overrule Petty's first issue because the trial court found

that Althouse was the proper outcry witness under two independent grounds and Petty has failed to challenge both of those grounds on appeal.

When reviewing a trial court's ruling, an appellate court will uphold the ruling if it is correct on any theory of law applicable to the case. *State v. Copeland*, 501 S.W.3d 610, 612–13 (Tex. Crim. App. 2016). A theory of law is applicable to a case when it is litigated at the trial-court level. *Id.* at 613. "An appellant must attack all independent grounds supporting a trial court's ruling." *Marsh v. State*, 343 S.W.3d 475, 479 (Tex. App.—Texarkana 2011, pet. ref'd). If a trial court's ruling can be sustained on an independent ground, an appellant must challenge all grounds on appeal. *Id.* When an appellant fails to challenge all independent grounds supporting the trial court's ruling on appeal, we must affirm the trial court's ruling on the unchallenged ground. *Id.*

At the trial-court level, the State argued that Althouse was the proper outcry witness on two independent grounds: (1) that Jade's refusal to cooperate with the prosecution and refusal to show up at the outcry hearing made her unavailable as the outcry witness, and (2) that the statement Lisa made to Jade was only a generalized statement of abuse. The trial court agreed with the State, finding that Jade was not available as a witness and that the statement made by Lisa to Jade "was a general statement lacking the specificity to qualify as an outcry statement." On appeal, Petty does not challenge the first ground for the trial court's ruling. That ground provided an independent basis for the trial court's ruling that Althouse was the proper outcry witness. *See Carty*, 178 S.W.3d at 306; *Foreman*, 995 S.W.2d at 859; *Anderson*,

14

831 S.W.2d at 54. Because Petty has failed to challenge that independent ground on appeal, we must affirm the trial court's designation of Althouse as the proper outcry witness. *See Marsh*, 343 S.W.3d at 479.

But even if we were to assume that Petty had challenged both independent grounds for the trial court's ruling on appeal, his first issue would be unavailing. The crux of Petty's first issue focuses on Vermillion's testimony that Lisa had told Jade that Lisa was "messing around" with Petty—testimony that aided the trial court in designating Althouse as the outcry witness and that ultimately led to Althouse testifying at trial regarding the statements Lisa told her during the forensic interviews. Petty objected to that testimony on hearsay and Confrontation Clause grounds, and the trial court overruled the objections. On appeal, Petty argues that the trial court abused its discretion by overruling those objections and that by overruling those objections, the trial court improperly designated Althouse as the outcry witness. However, at the pretrial hearing, Althouse also testified that Lisa had told Jade that Lisa and Petty "had messed around." That testimony came in without objection.

Generally, a party must object each time that objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.). "[W]hen a defendant objects to evidence at trial but later allows substantially the same evidence to be admitted without objection, any error in admitting the objected-to evidence is waived." *Garcia v. State*, 6 S.W.3d 765, 767 (Tex.

15

App.—Fort Worth 1999, pet. ref'd). By failing to object to Althouse's pretrial testimony that Lisa had told Jade that Lisa and Petty "had messed around," Petty has waived any complaint to Vermillion's pretrial testimony that Lisa had told Jade that Lisa was "messing around" with Petty.[20] *Gueder*, 115 S.W.3d at 13; *Garcia*, 6 S.W.3d at 767.

But even if Petty had challenged both independent grounds for the ruling, even if Petty had not waived this complaint, and even if the trial court had abused its discretion by designating Althouse as the outcry witness, the record does not demonstrate that Petty was harmed. Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b). *See* Tex. R. App. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). That Rule requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the

---

[20]Because we have held that Petty has waived this complaint, we need not address the State's argument that the Confrontation Clause and hearsay rules do not apply to pretrial outcry hearings. *See* Tex. R. App. P. 47.1.

16

record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In our harm analysis, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Here, Althouse's testimony at trial regarding the assault was largely cumulative of Lisa's testimony at trial regarding the assault. Althouse testified that Lisa told her that Petty put his "private part that goes pee" in her "private part . . . that goes pee," while Lisa testified that Petty put his penis in her vagina. Althouse testified that Lisa described the incident as occurring at night in the "kids' room" in the Avenue G house while the other children were asleep in the room, while Lisa testified that the incident occurred at night in the "kids' room" in the Kemp house while other children were asleep in the room. Althouse testified that Lisa described pain from the assault and described that her private parts felt wet following the assault, and Lisa testified that the abuse was painful and that she noticed that her vagina was wet after the assault. Such cumulative testimony from an outcry witness is harmless when the child victim also testifies about the abuse. *See Land v. State*, 291 S.W.3d 23, 28–31 (Tex. App.—Texarkana 2009, pet. ref'd) (holding that admission of recording of child's interview given at advocacy center was erroneous but harmless because recording was

17

cumulative of victim's properly admitted live testimony); *Duncan v. State*, 95 S.W.3d 669, 672 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding that improper admission of outcry testimony was harmless when similar testimony was admitted through victim).

Moreover, apart from Lisa's testimony regarding the assault, the DNA evidence also provides overwhelming evidence to support Petty's conviction. Webb testified that

- the probability that a randomly selected man would be excluded as being Lyle's biological father was greater than 99.99 percent and that Petty could not be excluded as being Lyle's biological father;

- that it is 144,000 times more likely that Petty is Lyle's biological father than that a randomly selected, unrelated male is his biological father; and

- that "based upon the most conservative probability of paternity statistics, and ignoring all non-genetic information, the probability that [Petty] is the biological father of [Lyle] is greater than 99.99 percent."

Such DNA evidence renders any error in the admission of Althouse's outcry testimony harmless. *See Carter v. State*, No. 14-20-00163-CR, 2021 WL 4434109, at *3 (Tex. App.—Houston [14th Dist.] Sept. 28, 2021, pet. ref'd) (mem. op., not designated for publication) ("Because. . . DNA evidence overwhelmingly demonstrated appellant's guilt, we cannot say that any improper admission of the outcry testimony had a substantial and injurious effect on the jury's verdict.").

18

Accordingly, we conclude, in the context of the entire case against Petty, any error by the admission of Althouse's outcry testimony did not have a substantial or injurious effect on the jury's verdict and did not affect Petty's substantial rights. *See King*, 953 S.W.2d at 271. Thus, even assuming error, we disregard it. *See* Tex. R. App. P. 44.2(b). We overrule Petty's first issue.

## B. Petty's Complaint That the Trial Court Refused to Admit Evidence Regarding Sexual Conduct Between Lisa and Scott

In his second issue, Petty argues that the trial court abused its discretion by refusing to admit evidence regarding sexual conduct between Lisa and her older brother, Scott. In response, the State argues, among other things, that Texas Rule of Evidence 412 prohibited such evidence, that Petty forfeited his argument that the State opened the door to such evidence, and that any error made by the trial court was harmless.

### 1. Background to Petty's Complaint

During trial, Petty's counsel informed the trial court that he wished to "get into the fact that . . . [Lisa] had some kind of sexual relationshi[p] with [Scott] around the same time as she claimed [Petty] committed the crime." The State objected, citing Rule 412. *See* Tex. R. Evid. 412. Petty's counsel responded that Rule 412 does not apply because it "excludes past sexual activity, and this is present sexual activity in relation to the crime[.]" The trial court did not rule on the admissibility of the evidence at that time.

19

Later, after Vermillion testified that he had spoken to Scott, Petty's counsel again argued that he should be able to ask questions regarding Lisa and Scott's sexual relationship, again arguing that "it's not past sexual history. It's present sexual history." The State argued that Rule 412 required the exclusion of such evidence and that such evidence would be prejudicial. The trial court agreed with the State.

The following exchange later occurred between Petty's counsel and Vermillion:

Q. [T]he DNA samples of the alleged victim and her child, were those taken voluntarily?

A. I got consent from the mother. The victim's mother.

Q. Did you obtain a search warrant to obtain the DNA?

A. I did for Mr. Petty – I'm sorry. Yes, I did. I'm sorry. I did get – I had her sign a consent for her other children, but not – but it was a search warrant for the victim and the infant.

Q. So – I'm sorry. I didn't quite understand. Did you obtain a search warrant for the victim and the victim's child?

A. Yes.

Q. Okay. So – but you also obtained a consent form?

A. Yeah. The consent form was for the older children that were in the house, the older brother, [Scott].

Petty's counsel then approached the bench, and he argued that in light of Vermillion's statement that Vermillion had obtained a DNA consent form for Scott, he should be able to ask further questions regarding Scott's sexual relationship with Lisa. Petty's counsel cited Rule 107 of the Texas Rules of Evidence, the rule of

optional completeness, to support his argument. *See* Tex. R. Evid. 107. In addition, Petty's counsel once again argued that the evidence should not be excluded under Rule 412 because it related to present conduct, not past conduct. After hearing arguments from both sides regarding the issue, the trial court excluded the evidence of Lisa's sexual relationship with Scott.

The trial court later admitted an exhibit, for record purposes only, to serve as Petty's offer of proof regarding the excluded evidence. That exhibit was an excerpt of Vermillion's investigation report, and it noted that on September 10, 2015—the day between the first and second forensic interviews—Jade contacted the CPS investigator and informed her that Lisa and Scott needed to tell authorities something. The exhibit notes that Vermillion met with Jade, Lisa, and Scott, and Jade informed Vermillion that Lisa and Scott had both told her that they had had sexual intercourse. It further reflects that Scott told Vermillion that he had had sex with Lisa, although Scott could not explain what sex was.[21] The exhibit also recounts that Scott and Lisa told Jade that they had had sex "when they were living on Britain Street." It further reflects that the family lived on Britain Street "sometime in early 2014," that the family then moved to an address on 9th Street where they lived for "about 9 months

---

[21]Vermillion's report notes that Scott "has documented retardation and mentally functions at a much lower level" and that Vermillion did not "believe [Scott] has the mental capacity to understand what sex is or if he even engaged in it." It also reflects that Scott was fourteen years old at the time.

(most of 2014)," before they moved to the Avenue G house "near the end of 2014," before moving to 7th Street, and then moving to the Kemp house "in early . . . 2015."

### 2. Applicable Law and the Standard of Review

Rule 412, known as the rape shield law, governs the admissibility of a complainant's prior sexual relationships with third parties in a sexual-assault case. *See* Tex. R. Evid. 412. Rule 412 attempts to limit abusive, embarrassing, and irrelevant inquiries into a complainant's private life and to encourage victims of sexual assault to report the crimes committed against them. *Green v. State*, No. 02-10-00082-CR, 2011 WL 3426278, at *5 (Tex. App.—Fort Worth Aug. 4, 2011, pet. ref'd) (mem. op., not designated for publication). The admissibility of a complainant's past sexual behavior is subject to a two-part test: (1) the evidence must fall within one of the five enumerated circumstances in Rule 412(b)(2), and (2) its probative value must outweigh the danger of unfair prejudice. Tex. R. Evid. 412(b)(2)–(3); *Bullock v. State*, No. 10-19-00031-CR, 2020 WL 103692, at *1 (Tex. App.—Waco Jan. 8, 2020, no pet.) (mem. op., not designated for publication).

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Green*, 2011 WL 3426278, at *4. A trial court does not abuse its discretion as long as the decision to admit or to exclude evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g); *Green*, 2011 WL 3426278, at *4.

### 3. Analysis

On appeal, Petty argues that Rule 412 does not apply because the sexual conduct between Lisa and Scott was "present" sexual conduct and not "past" sexual conduct.[22] We disagree. The exhibit offered by Petty reflects that Scott and Lisa had sex while the family was living on Britain Street. It further reflects that the family lived on Britain Street until sometime in early 2014, when they moved to 9th Street, where they lived for about nine months. The sexual encounter that occurred between Lisa and Scott on Britain Street in early 2014 has no bearing on the sexual assault that occurred to Lisa during late 2014 or early 2015. Because the sexual encounter between Lisa and Scott occurred almost a year before the sexual assault at issue in this case, we hold that Rule 412 applies. *See* Tex. R. Evid. 412(a)(2); *Green*, 2011 WL 3426278, at *5.

Because Rule 412 applies, to introduce evidence of Lisa's sexual relationship with Scott, Petty was required to prove that the evidence falls within one of the five enumerated circumstances in Rule 412(b)(2). *See* Tex. R. Evid. 412(b)(2); *Bullock*,

---

[22]To support his argument that Rule 412 does not apply, Petty points us to an unpublished concurring opinion by Justice Yeary on the Court of Criminal Appeals. *See Ukwuachu v. State*, PD-0366-17, 2018 WL 2711167, at *10 (Tex. Crim. App. June 6, 2018) (not designated for publication) (Yeary, J., concurring). In that opinion, Justice Yeary discussed whether Rule 412 applied to text messages that referred to potential sexual conduct in the future. *Id.* That discussion has no relevance to the evidence at issue here—prior sexual conduct. Indeed, in his concurring opinion, Justice Yeary noted that if the text messages had referred to past sexual behavior between the victim and someone other than the defendant, the messages "would be absolutely inadmissible under the terms of Rule 412(a)(2)." *Id.*

23

2020 WL 103692, at *1. Those circumstances require that the evidence: (1) is necessary to rebut or explain scientific or medical evidence offered by the prosecutor, (2) concerns past sexual behavior with the defendant and is offered by the defendant to prove consent, (3) relates to the victim's motive or bias, (4) is admissible under Rule 609, or (5) is constitutionally required to be admitted. Tex. R. Evid. 412(b)(2). Here, Petty makes no argument to suggest that any of the circumstances apply.[23] We thus hold that the trial court did not abuse its discretion by excluding the evidence of Lisa and Scott's relationship under Rule 412. *See* Tex. R. Evid. 412(b)(2); *Bullock*, 2020 WL 103692, at *1.

In his brief, Petty argues that even if Rule 412 would otherwise bar the evidence, the trial court still abused its discretion by excluding the evidence because Vermillion's testimony that he had obtained a DNA consent form for Scott "opened the door" to evidence of Lisa's sexual relationship with Scott. To support his argument, Petty cites generally to the common-law admissibility rule, and he concedes that Rule 107—the Rule he relied on to support his argument at trial—does not apply. In its brief, the State argues that Petty has forfeited his common-law opening-the-door theory because he did not make that argument at trial. We agree with the State. At trial, Petty did not raise the argument he now makes on appeal based on the common-law admissibility rule; instead, he relied on Rule 107, a Rule that Petty now

---

[23]Nor has Petty argued that the probative value of the evidence outweighs the danger of unfair prejudice. *See* Tex. R. Evid. 412(b)(3).

24

acknowledges does not apply. By failing to urge his common-law theory to the trial court, Petty has forfeited his complaint on appeal. *See* Tex. R. App. P. 33.1(a)(1)(A); *Golliday v. State*, 560 S.W.3d 664, 669 (Tex. Crim. App. 2018) ("Appellant was responsible for preserving the error he sought to raise on appeal by specifically articulating the legal basis for his proffer at trial."); *Resendez v. State*, 306 S.W.3d 308, 314 (Tex. Crim. App. 2009) ("[A] complaint that could, in isolation, be read to express more than one legal argument will generally not preserve all potentially relevant arguments for appeal.").

But even if the trial court had abused its discretion by refusing to admit evidence regarding the sexual relationship between Lisa and Scott, the record does not demonstrate that Petty was harmed. As we noted above, generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by Rule 44.2(b).[24] *See* Tex. R. App. P. 44.2(b); *Solomon*, 49 S.W.3d at 365. That Rule

---

[24]In his brief, Petty suggests that we should use the constitutional-harm analysis embodied in Rule 44.2(a). *See* Tex. R. App. P. 44.2(a). We disagree. The improper exclusion of evidence may raise a constitutional violation when a trial court erroneously excludes evidence that is vital to the case, and the exclusion precludes the defendant from presenting a defense. *Tillman v. State*, 376 S.W.3d 188, 198 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005)). "The Court of Criminal Appeals has noted that erroneous evidentiary rulings rarely rise to the level of denying a fundamental constitutional right to present a meaningful defense." *Id.* (citing *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002)). Indeed, "[a] constitutional violation arises only where the trial court's clearly erroneous ruling excludes otherwise relevant, reliable evidence forming such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* Here, the evidence that Petty sought to introduce did not preclude him from presenting a defense at trial. Indeed, at trial, Petty was able to

requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b). And as we stated above, a substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley*, 173 S.W.3d at 518. Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo*, 629 S.W.3d at 240.

Here, the evidence that the trial court excluded would have done nothing to cast doubt on Petty's guilt. The excluded evidence would have merely reflected that Lisa and Scott had sex in early 2014 while they were living on Britain Street. Given that Lisa had her period in December 2014, and given Lyle's October 2015 birth, the sexual encounter between Lisa and Scott in early 2014 does nothing to suggest that Petty did not sexually assault Lisa in late 2014 or early 2015. And, here (and as discussed more below when addressing Petty's sufficiency argument), there is substantial evidence to support Petty's conviction—namely, Lisa's testimony regarding the assault and Webb's testimony that the probability that Petty is Lyle's biological father is greater than 99.99 percent. Accordingly, we conclude that in the context of the entire case against Petty, any error in excluding the evidence of Lisa

present a defense that focused on the argument that Lisa was lying and that the DNA evidence was incorrect. The exclusion of the evidence that Lisa and Scott had engaged in sexual conduct in early 2014 did not prevent Petty from presenting a defense.

and Scott's sexual relationship did not have a substantial or injurious effect on the jury's verdict and did not affect Petty's substantial rights. *See King*, 953 S.W.2d at 271. Thus, even assuming error, we disregard it. *See* Tex. R. App. P. 44.2(b). We overrule Petty's second issue.

## C. Petty's Complaint Regarding the Sufficiency of the Evidence

In his third issue, Petty argues that the evidence is insufficient to support his conviction. He further argues that there was enough exculpatory evidence so that no rational jury could have found, beyond a reasonable doubt, that Petty was the person who sexually assaulted Lisa. In response, the State argues that the evidence is sufficient to support Petty's conviction.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App.

27

2021).  We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's.  *Queeman*, 520 S.W.3d at 622.  Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict.  *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence.").  We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution.  *Braughton*, 569 S.W.3d at 608.

### 2. Analysis

A person commits the offense of aggravated sexual assault of a child if (1) the person intentionally or knowingly causes the penetration of the sexual organ of a child by any means or causes the child's sexual organ to contact the actor's sexual organ, and (2) the victim is younger than fourteen years of age.  Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii), (a)(2)(B).  The indictment alleged that Petty intentionally or knowingly caused the penetration of Lisa's sexual organ by his sexual organ and that Lisa was a child younger than fourteen years of age at the time of that act.

Here, Lisa testified at trial that Petty had raped her.  She described Petty coming into her room while she was sleeping, him pulling down his pants and getting

28

on top of her, and him putting his penis in her vagina. She also testified that she was twelve when the assault occurred. This evidence is sufficient to support Petty's conviction.[25] *See Rickard v. State*, No. 02-18-00350-CR, 2019 WL 4866037, at *5 (Tex. App.—Fort Worth Oct. 3, 2019, pet. ref'd) (mem. op., not designated for publication) (holding that the testimony of a child sexual-assault victim alone is sufficient to support a conviction for aggravated sexual assault); *Glockzin v. State*, 220 S.W.3d 140, 147 (Tex. App.—Waco 2007, pet. ref'd) (same).

Moreover, Webb testified at trial that the probability that a randomly selected man would be excluded as being Lyle's biological father was greater than 99.99 percent and that Petty could not be excluded as being Lyle's biological father. Webb also testified that it was 144,000 times more likely that Petty is Lyle's biological father than a randomly selected, unrelated male. Webb ultimately concluded that "the probability that [Petty] is the biological father of [Lyle] is greater than 99.99 percent." This evidence is independently sufficient to support Petty's conviction. *See Coria-Gonzalez v. State*, No. 03-18-00645-CR, 2020 WL 465856, at *4 (Tex. App.—Austin

---

[25]In his brief, Petty argues that there was exculpatory evidence before the jury that proved that he did not sexually assault Lisa. He points to things like Lisa not being able to recall exactly when the assault took place, Lisa not attempting to wake others in the room during the assault, Lisa lying during the first forensic interview, and Lisa's use of the word "rape" during the second forensic interview. This evidence, according to Petty, was indicative of coaching. But that evidence goes to Lisa's credibility, and the jury, as the factfinder, is the sole judge of the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin*, 635 S.W.3d at 679.

Jan. 29, 2020, no pet.) (mem. op., not designated for publication) (holding that "DNA evidence alone can be legally sufficient to establish the identity of the perpetrator of a crime"); *Roberson v. State*, 16 S.W.3d 156, 168 (Tex. App.—Austin 2000, pet. ref'd) (concluding that DNA evidence alone was legally sufficient to establish perpetrator's identity and to support conviction for aggravated sexual assault); *Williams v. State*, 848 S.W.2d 915, 916–17 (Tex. App.—Texarkana 1993, no pet.) (concluding that evidence was legally sufficient to support conviction for aggravated sexual assault when only evidence connecting defendant to assault was DNA analysis).

Viewing this evidence—and the other evidence detailed in the factual background section above—in the light most favorable to the verdict, a rational juror could have found beyond a reasonable doubt that Petty intentionally or knowingly caused the penetration of Lisa's sexual organ by his sexual organ and that Lisa was a child younger than fourteen years of age at the time of that act. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Braughton*, 569 S.W.3d at 608. Thus, the evidence is sufficient to support Petty's conviction for aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii), (a)(2)(B). We overrule Petty's third issue.

## IV. CONCLUSION

Having overruled Petty's three issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 29, 2022